UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CONSENT DECREE** |
| | ) | |
| DAIMLER AG and | ) | |
| MERCEDES-BENZ USA, LLC, | ) | |
| | ) | Civil Action Nos.:   1:20-cv-2564 |
| Defendants. | ) | 1:20-cv-2565 |
| _____ | ) | |
| | ) | |
| PEOPLE OF THE STATE OF | ) | |
| CALIFORNIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAIMLER AG and | ) | |
| MERCEDES-BENZ USA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ........................................................................4
II.     APPLICABILITY ........................................................................................5
III.    DEFINITIONS ............................................................................................6
IV.     CIVIL PENALTY ......................................................................................23
V.      APPROVAL OF SUBMISSIONS; U.S./EPA/CARB DECISION-MAKING ...........................25
VI.     SUBJECT VEHICLE COMPLIANCE...........................................................28
VII.    CORPORATE COMPLIANCE ....................................................................41
VIII.   MITIGATION ..........................................................................................73
IX.     REPORTING REQUIREMENTS ................................................................77
X.      STIPULATED PENALTIES .......................................................................86
XI.     FORCE MAJEURE ................................................................................. 115
XII.    DISPUTE RESOLUTION ........................................................................ 117
XIII.   INFORMATION COLLECTION AND RETENTION................................. 121
XIV.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS........................ 124
XV.     COSTS .................................................................................................. 128
XVI.    NOTICES .............................................................................................. 128
XVII.   EFFECTIVE DATE................................................................................. 132
XVIII.  RETENTION OF JURISDICTION ........................................................... 133
XIX.    MODIFICATION.................................................................................... 133
XX.     TERMINATION..................................................................................... 134
XXI.    PUBLIC PARTICIPATION ..................................................................... 135
XXII.   SIGNATORIES/SERVICE ...................................................................... 135
XXIII.  INTEGRATION..................................................................................... 136
XXIV.   26 U.S.C. § 162(F)(2)(A)(II) IDENTIFICATION............................................ 137
XXV.    FINAL JUDGMENT ............................................................................... 137
XXVI.   HEADINGS .......................................................................................... 137
XXVII.  APPENDICES ....................................................................................... 137

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), is, concurrent with the lodging of this Consent Decree, filing a complaint in this action ("U.S. Complaint"), against Daimler AG and Mercedes-Benz USA, LLC (collectively, "Defendants"), alleging that Defendants violated Sections 203(a)(1), (a)(2)(A), (a)(3)(A), and (a)(3)(B) of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7522(a)(1), (a)(2)(A), (a)(3)(A), and (a)(3)(B), with regard to about 250,000 Model Year ("MY") 2009 to 2016 BlueTEC II diesel vehicles (collectively, "Subject Vehicles").

WHEREAS, the U.S. Complaint alleges that each Subject Vehicle contains, as part of the electronic control unit ("ECU"), certain software functions and calibrations that cause the emission control system of those vehicles to perform differently during normal vehicle operation and use than during emissions testing. The U.S. Complaint alleges that these software functions and calibrations are undisclosed "Auxiliary Emission Control Devices" ("AECDs") in violation of the Act and that some of these software functions and calibrations are also prohibited Defeat Devices under the Act. The U.S. Complaint also alleges that during normal vehicle operation and use, the Subject Vehicles emit increased levels of oxides of nitrogen ("$NO_x$"). The U.S. Complaint alleges and asserts claims for relief related to the presence of the undisclosed AECDs and Defeat Devices in the Subject Vehicles.

WHEREAS, Plaintiff the People of the State of California, acting by and through Xavier Becerra, Attorney General of the State of California ("the California Attorney General"), and the California Air Resources Board ("CARB"), are concurrently with the lodging of this Consent Decree filing a complaint in this action (the "California Complaint"), against Defendants. In the California Complaint, CARB alleges that Defendants violated certain provisions of California law, including without limitation California Health and Safety Code sections 43016, 43106,

43151, 43152, 43153, 43205, 43211, and 43212; 13 C.C.R. §§ 1961, 1961.2, 1965, 1968.2, and 2037; and 42 U.S.C. § 7604 and 40 C.F.R. § 54.3 with regard to 36,946 Model Year 2009 to 2016 BlueTEC II diesel vehicles (a subset of "Subject Vehicles"). For his part, the California Attorney General alleges that Defendants, through their violation of the sections of California Health and Safety Code and Code of Regulations pled by CARB, engaged in unlawful business acts or practices, within the meaning of California Business and Professions Code § 17200 et seq.

WHEREAS, the California Complaint alleges, among other things, that the Subject Vehicles contain undisclosed AECDs and prohibited Defeat Devices, as well as several unreported, unapproved running changes and field fixes, that have resulted in, and continue to result in, increased $NO_x$ emissions from each Subject Vehicle significantly in excess of California limits.

WHEREAS, Defendants deny the allegations in the Complaints and do not admit any liability to the United States, California, or otherwise arising out of or in connection with the allegations in the Complaints.

WHEREAS, in 2017 and 2018, EPA and CARB certified that the configuration of software and calibrations installed in the 6-cylinder Sprinters for MYs 2017 and 2018, respectively, complied with the requirements of the Clean Air Act and, as to CARB, also with California law.

WHEREAS, Defendants will update the configuration of software and calibrations in the Eligible Vehicles in Emission Modification Categories 1 and 2 with the MY17/18 Sprinter certified configuration, and will make certain changes in the hardware, as listed in Appendix B,

Attachment I, to each Eligible Vehicle in Emission Modification Categories 1 and 2, consistent with the MY17/18 Sprinters.

WHEREAS, Defendants will update the configuration of hardware, software, and calibrations in the Eligible Vehicles in Emission Modification Category 9 (4-cylinder GLK 250s) as listed in Appendix B, Attachment I. The Defendants made these updates on an Emission Test Vehicle for Emission Modification Category 9, and conducted testing prior to lodging this Consent Decree in accordance with an agreed-upon protocol with EPA/CARB, as set forth in Appendix B.

WHEREAS, Defendants will update the configuration of hardware, software, and calibrations in the Eligible Vehicles in the other Emission Modification Categories as listed in Appendix B, Attachment I.

WHEREAS, based upon the results of the aforementioned testing of Emission Modification Category 9 and the accompanying Updated AECD Document, and based upon required testing pursuant to this Consent Decree for the other Emission Modification Categories, EPA/CARB consider the updates to the Eligible Vehicles set forth in this Consent Decree, together with the other terms set forth in this Consent Decree, to be an appropriate remedy for, and to resolve in full, the allegations in the U.S. and California Complaints, as set forth in Section XIV below.

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that the United States and CARB are not issuing new Certificates of Conformity or Executive Orders, respectively, for the Subject Vehicles, nor are they revoking the existing Certificates of Conformity or Executive Orders for the Subject Vehicles.

WHEREAS, this Consent Decree is being filed during the COVID-19 pandemic, and all Parties are mindful of the health and safety of the public and of their respective employees, and cognizant of potential and uncertain impacts on work due to travel and social distancing restrictions implemented to limit the spread of COVID-19 during the pandemic, and take these important considerations into account, as described in Paragraph 65 of this Consent Decree.

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties regarding the claims alleged in the Complaints, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.       JURISDICTION AND VENUE

1.       This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 203, 204, and 205 of the Act, 42 U.S.C. §§ 7522, 7523, and 7524, and over the Parties. Venue lies in this District pursuant to 28 U.S.C. § 1391 (b), (c). The Court has supplemental jurisdiction over the California State law claims pursuant to 28 U.S.C. § 1367. For purposes of this Consent Decree, or in any action to enforce this Consent Decree, the Parties agree to and Defendants consent to this Court's jurisdiction over this Consent Decree and over any action to enforce this Consent Decree, and over Defendants, and consent to venue in this judicial district. Defendants reserve the right to challenge and oppose any claims to jurisdiction that do not arise from the Court's jurisdiction over this Consent Decree or an action to enforce this Consent Decree.

2.      For purposes of this Consent Decree only, Defendants agree that the U.S. Complaint states claims upon which relief may be granted pursuant to Sections 203, 204, and 205 of the Act, 42 U.S.C. §§ 7522, 7523, and 7524, and that the California Complaint states claims upon which relief may be granted pursuant to California Health and Safety Code sections 43016, 43106, 43151, 43152, 43153, 43205, 43211, and 43212; California Business and Professions Code § 17200 et seq.; 13 C.C.R. §§ 1961, 1961.2, 1965, 1968.2, and 2037; and 42 U.S.C. § 7604 and 40 C.F.R. § 54.3.

## II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and California, and upon Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of this Consent Decree are implemented.  At least 30 Days prior to such transfer, Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the United States and CARB, in accordance with Section XVI (Notices).  Notwithstanding the foregoing, the provisions of this Paragraph do not apply to a transfer of ownership or operations between or among Daimler group companies.

5.      Defendants shall provide a copy of this Consent Decree to the members of their respective Board of Management and/or Board of Directors and to their officers and executives whose duties might reasonably include compliance with, or oversight over compliance with, any provision of this Consent Decree.  Defendants shall also ensure that any contractors retained to

perform work required under the material terms of this Consent Decree, agents, or employees whose duties might reasonably include compliance with any provision of this Consent Decree are made aware of those requirements relevant to their performance. Defendants shall undertake reasonable best efforts to condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their respective officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree, except in accordance with the provisions of Section XI (Force Majeure), below.

## III.   DEFINITIONS

7.      Capitalized terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree. Likewise, where context-appropriate, capitalized terms that are defined in the California Health and Safety Code or in CARB regulations promulgated pursuant to the California Health and Safety Code shall have the meanings assigned to them in the California Health and Safety Code or such regulations, unless otherwise provided in this Consent Decree. Capitalized terms that are defined in this Consent Decree are defined for purposes of this Consent Decree only and are not defined or applicable for any other purpose. Whenever the capitalized terms set forth below are used in this Consent Decree, the following definitions shall apply:

> "20º F FTP" means the FTP conducted at 20º Fahrenheit, as specified in 40 C.F.R. Part 1066, Subpart H.

> "Aftertreatment System" or "ATS," for purposes of Section XI (Force Majeure) and Appendix B, Paragraph 1.e only, means the exhaust system consisting of the diesel oxidation catalyst (DOC), diesel particulate filter (DPF), SCR catalyst,

exhaust temperature sensors, the PM Sensor (where equipped), one $NO_x$ Sensor upstream from the SCR catalyst, and one $NO_x$ Sensor downstream from the SCR catalyst.

"Air Pollution Control Fund" means the fund established by California Health and Safety Code section 43015.

"Approved Emission Modification" means an emission modification submitted by Defendants pursuant to Appendix B, Paragraph 4 and approved by EPA/CARB pursuant to Appendix B, Paragraph 5.a.

"Audit Plan" means the annual plan in which the PSAT will identify topics for internal audit.

"Audit Report" means the report produced by the PSAT after the completion of the audit year, *i.e.*, after completion of the final audit in a series of audits within a designated year.

"Audit Committee of the Supervisory Board" means the committee consisting of four Supervisory Board members elected by a majority vote, which, among other duties, oversees Corporate Audit and external auditors.

"Auxiliary Emission Control Device" or "AECD" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"Bench-aged" means aging that is conducted pursuant to Appendix B, Paragraph 1.e.i.

"Board of Management" or "BoM" means the managerial board of Daimler AG, which is responsible for directing, coordinating, and controlling business activities in accordance with the goals it defines for Daimler in the best interests of the Company.

"Business Day" means a calendar day that does not fall on a Saturday, Sunday, or federal or California holiday. In computing any period of time under this Consent Decree, where the last Day would fall on a Saturday, Sunday, or federal or California holiday, the period shall run until the close of business of the next Business Day.

"Business Partner Integrity Management" means Daimler's program regarding business partner integrity and compliance.

"Business Practices Office" or "BPO" means Daimler's central whistleblower system.

"Buyback," for purposes of Appendix A, Paragraph 18.j only, means the return of an Eligible Vehicle by an Eligible Owner to Defendants, in exchange for a payment that equals or exceeds the National Automobile Dealers Association ("NADA") Clean Retail value of the Eligible Vehicle (adjusted for options, mileage, and NADA region in accordance with the then-current NADA guide) as of January 1, 2020.

"CA AG" means the California Attorney General's Office and any of its successor departments or agencies.

"CALID" means calibration identification for the software installed on any ECU as part of the Approved Emission Modification.

"California" or "CA" means the People of the State of California, acting by and through the California Air Resources Board, and where it is used to refer to specific statutes or regulations only, it means the State of California.

"California Attorney General" means the California Attorney General's Office and any of its successor departments or agencies.

"California Complaint" means the complaint filed by California in this action.

"California Passenger Vehicle EMP Rate" means the 85 percent rate for Passenger Vehicles in California specified in Appendix A, Paragraph 4.

"California Sprinter EMP Rate" means the 85 percent rate for Sprinters in California specified in Appendix A, Paragraph 4.

"CARB" means the California Air Resources Board and any of its successor departments or agencies.

"CBP" means the United States Customs and Border Protection and any of its successor departments or agencies.

"CDCS" means Consolidated Debt Collection System.

"CDX" means Central Data Exchange, the EPA's electronic reporting site which can be found at https://cdx.epa.gov/epa_home.asp.

"Central Powertrain Controller" or "CPC" means the electronic hardware device, together with the software and calibrations installed on the device, that links other control units, such as the ECU and TCU, to the rest of the vehicle and, in conjunction with other control units, controls the vehicle powertrain.

"Certificate of Conformity" means the document that EPA issues to a vehicle manufacturer to certify that a vehicle class conforms to EPA requirements.

"Class 1 Additional OBD Noncompliance" means the OBD Noncompliances described in Paragraph 53.c.ii.A.

"Class 2 Additional OBD Noncompliance" means the OBD Noncompliances described in Paragraph 53.c.ii.B.

"Class Action Settlement" means a consumer class action settlement agreement and release filed in *In re Mercedes-Benz Emissions Litig.*, 2:16-cv-00881 (D.N.J.), by attorneys representing owners and lessees of Subject Vehicles. If a court issues an order granting final approval of a proposed consumer class action settlement agreement and release in *In re Mercedes-Benz Emissions Litig.*, 2:16-

cv-00881 (D.N.J.), "Class Action Settlement" means that agreement as and in the form it is ultimately approved and entered by the court.

"Clean Air Act" or "Act" means 42 U.S.C. §§ 7401–7671q.

"Clearing Case" means a question or topic submitted into and resolved through the cross-functional decision-making process.

"CO" means carbon monoxide.

"$CO_2$" means carbon dioxide.

"Combined Uphill/Downhill and Highway Route" means the driving route shown and described in Appendix B, Attachment D.

"Committee for Legal Affairs of the Daimler AG Supervisory Board" or "Committee for Legal Affairs" means the special committee of the Daimler AG Supervisory Board, which will direct and supervise the PSAT and retain the ECC.

"Complaints" means the U.S. Complaint and the California Complaint.

"Compliance Awareness Modules" or "CAM" means the integrity and compliance awareness modules provided to Daimler business partners.

"Compliance Board" means the committee led by the Chief Compliance Officer and comprising of the responsible individual for each compliance field as well as the responsible individual for Compliance Management Systems & Processes and Legal Digital Transformation Strategy, which governs Daimler's compliance strategy and steers and harmonizes overarching compliance activities.

"Compliance Management System" or "CMS" means Daimler's overall compliance management system.

"Confidential Business Information" or "CBI" means information protected under 40 C.F.R. Part 2 and/or comparable California law, including California Government Code § 6254(k) and 17 C.C.R. §§ 91000 et seq.

"Consent Decree" or "Decree" means this Consent Decree and all Appendices and Attachments attached hereto.

"Consumer Emission Modification Disclosure" means the disclosure to all affected Eligible Owners and Eligible Lessees required pursuant to Appendix A, Paragraph 15.

"Cooling Phase" means the period of operation in which the ATS is returned to normal operating temperature and shall last for at least the number of seconds specified in the Updated AECD Document for Emission Modification Category 9.

"Corporate Audit" means the independent and objective Company-wide assurance function of Daimler and its affiliates.

"Curb Weight" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"CVN" means calibration verification number for the software installed on any ECU as part of the Approved Emission Modification.

"Date of Lodging" means the date this Consent Decree is filed for lodging with the Court.

"Day" means a calendar day, unless expressly stated to be a Business Day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or California holiday, the period shall run until the close of business of the next Business Day.

"Dealer" means any entity authorized by MBUSA or DVUSA, subject to a written dealer agreement, to sell and/or service Subject Vehicles in the United States.

"Dealer Emission Modification Disclosure" means the disclosure to all Dealers required pursuant to Appendix A, Paragraph 17.

"Defeat Device" has the meaning provided under 40 C.F.R. § 86.1803-01 and 42 U.S.C. § 7522(a)(3)(B).

"Defendants" means the entities named in the U.S. Complaint and California Complaint, specifically, Daimler AG and Mercedes-Benz USA, LLC.

"Deterioration Factor" or "DF" means the number, determined pursuant to 40 C.F.R. § 86.1823-08, that represents the change in emissions performance during a vehicle's Full Useful Life.

"Diesel Exhaust Fluid" or "DEF" means a liquid reducing agent used in conjunction with selective catalytic reduction to reduce $NO_x$ emissions. DEF is generally understood to be an aqueous solution of urea conforming to the specification of ISO 22241.

"Diesel Oxidation Catalyst System" or "DOC System" means all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other elements of design that collectively constitute the system for, among other things, controlling emissions of carbon monoxide and hydrocarbons, together with other pollutants, through a chemical reaction accelerated by an oxidation catalyst.

"Diesel Particulate Filter System" or "DPF System" means all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other elements of design that collectively constitute the system for, among other things, controlling emissions of particulate matter by trapping such particulates in a filter and periodically oxidizing them through thermal regeneration of the filter.

"Dosing Control Unit" or "DCU" means the electronic hardware device, together with the software and calibrations installed on the device, that controls, among other things, the operation of the DEF dosing system in the Subject Vehicles.

"DPF Regeneration Event" means an event triggered by the ECU that increases exhaust temperature for a limited time period to oxidize particulate matter collected on and within the diesel particulate filter.

"Drivability" means the combination of agile and smooth delivery of power, as demanded by the driver or operator.

"DVUSA" means Daimler Vans USA, LLC.

"E1" means executive level employee directly reporting to a BoM member.

"E2" means senior manager-level employee.

"E3" means manager-level employee, senior to E4.

"E4" means manager-level employee.

"Effective Date" or "Date of Entry" means the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

"Effectiveness Evaluation" means the annual process by which Daimler evaluates the effectiveness of the various aspects of its compliance management systems.

"Eligible Lessee" means (1) the current lessee or lessees of an Eligible Vehicle with an active lease as of the date the Eligible Vehicle receives the Approved Emission Modification; or (2) solely for purposes of any applicable Extended Modification Warranty, the subsequent lessee or lessees of an Eligible Vehicle that has received the Approved Emission Modification.

"Eligible Owner" means the (1) owner or owners of an Eligible Vehicle on the day that the Eligible Vehicle receives or is eligible to receive the Approved Emission Modification or (2) solely for purposes of any applicable Extended Modification Warranty, the subsequent owner or owners of an Eligible Vehicle that has received the Approved Emission Modification.

"Eligible Vehicle" means any vehicle in an Emission Modification Category identified in Appendix B, Attachment I that is (1) registered with a state Department of Motor Vehicles or equivalent agency or held by a Dealer or unaffiliated dealer and located in the United States or its territories; and (2) Operable as of the date the vehicle is brought in for the Approved Emission Modification.

"Emission Control System" has the meaning set forth at 40 C.F.R. § 86.1803-01, and at "California 2001 through 2014 Model Criteria Pollutant Exhaust Emission Standards and Test Procedures and 2009 through 2016 Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles," Part I: C.3.3.2 and "California 2015 and Subsequent Model Criteria Pollutant Exhaust Emission Standards and Test Procedures and 2017 and Subsequent Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks, and

Medium-Duty Vehicles," Part I: C.3.3.2, the latter two of which are incorporated by reference in 13 C.C.R. §§ 1961 & 1961(d).

"Emission Control System Extended Modification Warranty" means the warranty provided in Appendix A, Paragraph 18.a.

"Emission-Related" means, for the purpose of Section VII (Corporate Compliance), hardware that is included on the Emission-Related Parts List described in Section VII, Paragraph 30.h.ii or ECU, TCU, DCU, or CPC software or software calibrations.

"Emission Modification Category" means one of the 12 categories of Models and Model Years as identified in the sixth column of Appendix B, Attachment I.

"Emission Modification Configuration" means the update(s) to the Subject Vehicles in an Emission Modification Category, pursuant to the process outlined in Appendix B.

"Emission Modification Database" means a searchable database that Defendants make available online for a minimum of ten years, by which users may conduct a free-of-charge search by vehicle VIN to determine the information required pursuant to Appendix A, Paragraphs 16.c and 16.d.

"Emission Modification Proposal Report" means the report specified in Appendix B, Paragraph 4.a.

"Emission Modification Program" means the program specified in Appendix A, Paragraph 1.

"Emission Standard" means the FUL emission standard specified in the fourth column of Appendix B, Attachment I for the given row. If EPA/CARB approve a proposed Emission Modification Configuration that meets the Emission Standard First Threshold or Emission Standard Upper Threshold, then where this Consent Decree, Test Protocol and other Appendices and Attachments use the term, "Emission Standard," that term shall be replaced with Emission Standard First Threshold or Emission Standard Upper Threshold, as relevant for the AEM for that Emission Modification Category.

"Emission Standard First Threshold" means the FUL emission standard, as follows: Emission Modification Categories 4–8 and 11–12: Tier 2, Bin 6, as set forth in 40 C.F.R. § 86.1811-04(c)(6), Tier 2, LDT4, as set forth in 40 C.F.R. § 86.1811-04(f), Highway $NO_x$ exhaust emission standard, as set forth in 40 C.F.R. § 86.1811-04(j), and LEV II ULEV, as set forth in 13 C.C.R. § 1961.

"Emission Standard Upper Threshold" means the FUL emission standard, as follows:

    (1)    Emission Modification Categories 4–8 and 11–12: Tier 2, Bin 7, as set forth in 40 C.F.R. § 86.1811-04(c)(6), Tier 2, LDT4, as set forth in 40 C.F.R. § 86.1811-04(f), Highway $NO_x$ exhaust emission standard, as

set forth in 40 C.F.R. § 86.1811-04(j), and LEV II ULEV, as set forth in 13 C.C.R. § 1961.

(2)      Emission Modification Category 10: Tier 3, Bin 160, as set forth in 40 C.F.R. § 86.1811-17(b), Highway $NO_x$ exhaust emission standard, as set forth in 40 C.F.R. § 86.1811-17(c), and LEV III LEV 160, as set forth in 13 C.C.R. § 1961.2.

"Emission Plus Test Vehicles" or "EPTV" means the Test Vehicles listed in Appendix B, Attachment A, Table 1.

"Emission Plus Test Vehicle 1" or "EPTV 1" means the Emission Plus Test Vehicle tested for the emission, special cycle, and PEMS tests pursuant to Appendix B, Paragraph 2.b.

"Emission Plus Test Vehicle 2" or "EPTV 2" means the Emission Plus Test Vehicle tested for the A-to-B fuel economy testing pursuant to Appendix B, Paragraph 2.c.i, and the A-to-B NVH and A-to-B Drivability testing pursuant to Appendix B, Paragraphs 2.c.ii and 2.c.iii, unless a third vehicle, Emission Plus Test Vehicle 3, is tested for the A-to-B NVH and A-to-B Drivability testing.

"Emission Plus Test Vehicle 3" or "EPTV 3" means an additional Emission Plus Test Vehicle that may be tested for the A-to-B NVH and the A-to-B Drivability testing pursuant to Appendix B, Paragraphs 2.c.ii and 2.c.iii.

"Engine Control Unit" or "ECU" means an electronic hardware device, together with the software and calibrations installed on the device, that controls, among other things, the operation of the Emission Control System in the Subject Vehicles.

"Engineering Practices Board" or "EPB" means the committee consisting of mainly E1-level representatives from IL/P, R&D, Certification, tCMS R&D, Communications, and External Affairs which considers issues escalated from the TCC.

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

"EPA/CARB" means EPA and CARB jointly, or EPA or CARB, as applicable.

"ETK" means a development tool that includes the functions of an ECU and is an abbreviation for "Emulator Tast Kopf."

"Exhaust Gas Recirculation System" or "EGR System" means all hardware, components, parts, sensors, subassemblies software, AECDs, calibrations, and other elements of design that collectively constitute the system for recirculating gas from the engine's exhaust manifold into the pipe in front of the intake manifold of the engine.

"Executive Order" means an order issued by CARB to certify a particular MY test group in combination with one or more evaporative families that meets CARB

13

regulatory requirements for importation into and entry into commerce in California.

"Extended Modification Warranty" means the extended warranty specified in Appendix A, Paragraph 18.

"Extended Warranty Period" means the warranty period defined at Appendix A, Paragraph 18.b.

"External Compliance Consultant" or "ECC" means the external individual retained by the Committee for Legal Affairs to advise and assist the Committee for Legal Affairs as it directs and supervises the PSAT.

"Flat File" means a comprehensive file that consists of a series of rows of test records organized in columns of test parameters or variables from dynamometer or portable emission measurement system (PEMS) tests. The unique records are identified in a tabular format by test vehicle, test ID, test type (for dynamometer) or route (for PEMS), and phase number (for dynamometer) or route segment (for PEMS). The tabular file is to be provided in Excel format.

"FLU" means the Financial Litigation Unit of the United States Attorney's Office.

"FTP 72" or "Urban Dynamometer Driving Schedule" or "UDDS" means the drive cycle set forth at 40 C.F.R. Part 86, Appendix I (Dynamometer Schedules).

"FTP 72 Prep Cycle" means a single FTP 72 drive cycle.

"Federal Test Procedure" or "FTP75" means the emission test cycle described in 40 C.F.R. § 86.135-12 and the procedures set forth at 40 C.F.R. §§ 1066.810–1066.820.

"Full Useful Life" or "FUL" has the meaning set forth in 40 C.F.R. § 86.1805-12.

"Functional Group Leader" means an experienced engineer with expertise regarding certain functions who serves as an expert contact for questions, assists with data checks, and confirms compliance of functionalities.

"Gross Vehicle Weight" or "GVW" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"Gross Vehicle Weight Rating" or "GVWR" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"Group Risk Management Committee" or "GRMC" means the committee which evaluates risk to Daimler. The GRMC consists of representatives from the Accounting & Financial Reporting, Legal, Compliance, Legal Product & Technical Compliance, Corporate & Data Security departments, and CFOs of Mercedes-Benz AG, Daimler Truck AG, and Daimler Mobility AG. It is chaired by the BoM Member for Finance & Controlling and the BoM Member for Integrity and Legal Affairs of Daimler AG. Corporate Audit participates in the

GRMC and delivers material findings on the Internal Control and Risk Management System.

"Heavy Duty Vehicle" or "HDV" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"Highway Fuel Economy Test" or "HWFET" means the emission test cycle described in 40 C.F.R. § 600.109-08(b) and Appendix I (Highway Fuel Economy Driving Schedule) to Part 600 and the procedure described in 40 C.F.R. § 1066.840.

"Hydraulic Control Unit" or "HCU" means the electronic and hydraulic hardware device which consists of the hydraulic switch plate, the Transmission Control Unit, and the electromagnetic valves to control, among other things, the hydraulic pressure for the operation of the transmission in the Subject Vehicles.

"Include" and "Including," as used in this Consent Decree and accompanying Appendices and Attachments, are not limiting terms.

"Infopoint Integrity" means the central hotline accessible Company-wide to all employees, serving as a point of contact for all integrity issues, including questions on technical compliance.

"Infrequent Regeneration Adjustment Factor" or "IRAF" means the additive or upward adjustment factor for each pollutant used to account for increased emissions caused by periodic regeneration of any aftertreatment device. The increased emissions caused by such events are accounted for by adjustment factors, or IRAFs, for the pollutants NMOG, $NO_x$, CO, and PM, as applicable.

"Inspection and Maintenance Mandatory Recall Noncompliance" means the OBD Noncompliances described in Paragraph 53.c.v.

"Integrity and Legal Affairs" or "IL" mean overarching BoM responsibility for legal, integrity, and compliance.

"In-Use Group 1" means, for the purpose of in-use testing pursuant to Paragraph 19.b, Emission Modification Category 1.

"In-Use Group 2" means, for the purpose of in-use testing pursuant to Paragraph 19.b, Emission Modification Categories 9, 10, 11, and 12.

"In-Use Group 3" means, for the purpose of in-use testing pursuant to Paragraph 19.b, Emission Modification Category 3.

"In-Use Group 4" means, for the purpose of in-use testing pursuant to Paragraph 19.b, Emission Modification Categories 4 and 5.

"In-Use Group 5" means, for the purpose of in-use testing pursuant to Paragraph 19.b, Emission Modification Categories 7 and 8.

"IT" means information technology.

"IUCP" means the in-use confirmatory test plan described in Paragraph 19.b.

"IUCP Vehicles" means vehicles that meet the requirements of Paragraph 19.b.iii.

"IUVT Vehicles" means vehicles that meet the requirements of Paragraph 19.b.i.

"Lease Termination" means, for purposes of Appendix A, Paragraph 18.j only, the return of an Eligible Vehicle by an Eligible Lessee to the lessor, at no cost to the Eligible Lessee and with full cancellation of the remaining terms of the lease with no financial or other penalty, under terms specified in Appendix A, Paragraph 18.j.

"Legal Product & Technical Compliance" or "IL/P" mean the department consisting of lawyers, engineers, and business experts, which designs and develops tCMS elements, participates in the cross-functional decision-making process, conducts independent second-line testing of tCMS controls, and provides Daimler-wide tCMS monitoring and improvement initiatives.

"Light Duty Truck" or "LDT" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"Light Duty Vehicle" or "LDV" has the meaning set forth in 40 C.F.R. § 86.1803-01.

"Low-Emission Vehicle III" or "LEV III" means the LEV III emission standards in 13 C.C.R. § 1961.2 and the incorporated test procedures (incorporated by reference in 40 C.F.R. § 86.1(d)(1)(i)).

"Malfunction" means a circumstance where a Test Vehicle experiences a mechanical or electrical problem, including as the result of damage or accident, that (1) renders the vehicle inoperable, (2) presents a safety or environmental hazard if the vehicle continues to be operated (such as an oil leak), or (3) causes an OBD event (for example, recording a pending fault code or illuminating the MIL), except for the following OBD events: (a) OBD events during OBD demonstration testing, (b) DEF/fuel tank level sloshing diagnostics (P21C5), and (c) false detection or MIL illumination due to chassis dynamometer simulation testing, unless such false detection or MIL illumination causes a default action or default strategy that changes the emission performance behavior.

"Materials" means Submissions and other documents, certifications, plans, reports, notifications, statements of position, data, or other information required by or submitted pursuant to this Consent Decree.

"Mercedes-Benz USA, LLC" or "MBUSA" means the U.S. division of Mercedes-Benz Cars.

"Mercedes-Benz Research & Development North America, Inc." or "MBRDNA" means the North American research and development-related service provider for Mercedes-Benz Cars.

16

"MIL" means the malfunction indicator light of the OBD system outlined in 13 C.C.R. § 1968.2 that illuminates to notify the vehicle operator of detected malfunctions.

"Mileage" means vehicle mileage recorded on the odometer.

"Model" has the meaning set forth in 40 C.F.R. § 600.002 for "Model type."

"Modified Eligible Vehicle" means an Eligible Vehicle that has received an Approved Emission Modification.

"MPG" means miles per gallon.

"Model Year" or "MY" has the meaning set forth in 40 C.F.R. § 600.002.

"MY16 Six-Cylinder GLE 350ds" means the six OM642 (6-cylinder) MY16 GLE 350d vehicles with VINs 4JGDA2EB1GA598863, 4JGDA2EB8GA755062, 4JGDA2EB7GA754985, 4JGDA2EB3GA755003, 4JGDA2EB0GA754794, and 4JGDA2EBXGA754916 that Defendants sold or offered for sale in, or introduced or delivered for introduction into commerce in the United States, or imported into the United States.

"MY17/18 Sprinters" means the OM642 (6-cylinder) Sprinters that were issued final Certificates of Conformity HMBXD03.0HD1-034-R01, HMBXD03.0HD2-035, HMBXD03.0HD3-036, HMBXD03.0HD4-037, JMBXD03.0HD1-030, JMBXD03.0HD2-031, JMBXD03.0HD3-032, JMBXD03.0HD4-033-R01 in Model Years 2017 and 2018 and issued Executive Orders A-003-0591-1, A-003-0592-1, A-003-0593-1, A-003-0594-1, A-003-0630, A-003-0631, A-003-0632, and A-003-0633.

"NHTSA" means the National Highway Traffic Safety Administration.

"National Passenger Vehicle EMP Rate" means the 85 percent nationwide rate for Passenger Vehicles specified in Appendix A, Paragraph 4.

"National Sprinter EMP Rate" means the 85 percent nationwide rate for Sprinters specified in Appendix A, Paragraph 4.

"Neutral Intermediary" means an independent external attorney available to receive reports to the BPO in Germany.

"Noise, Vibration, and Harshness" or "NVH" means a measure of the noise level heard during driving and in idle, the vibrations felt during driving and in idle, and the acoustic harshness (which is the transition area between tactile vibration and hearable noise) of the ride of the vehicle.

"NMHC" means "non-methane hydrocarbons," *i.e.*, the sum of all hydrocarbon species except methane.

"Normal Mode" means the period of operation in which the ATS is operated at temperatures consistent with normal vehicle operation and shall last for at least

the number of seconds specified in the Updated AECD Document for Emission Modification Category 9.

"$NO_x$" means oxides of nitrogen, *i.e.*, the sum of the nitric oxide and nitrogen dioxide contained in a gas sample as if the nitric oxide were in the form of nitrogen dioxide.

"$NO_x$ Sensor(s)" means a sensor located in a vehicle's exhaust system which directly or indirectly measures $NO_x$ or related characteristics.

"On-board Diagnostic System" or "OBD System" means all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other elements of design that collectively constitute the system for monitoring all systems and components that must be monitored pursuant to the version of 13 C.C.R. § 1968.2 applicable at the time of certification for the particular Model Year of a Subject Vehicle, for the purpose of identifying and detecting malfunctions of such monitored systems and components, and for alerting the driver of such potential malfunctions by illuminating the MIL.

"OBD Clusters" means the groupings of the Subject Vehicles as identified in the eighth column of Appendix B, Attachment I.

"OBD Demonstration Vehicle" means the Test Vehicles listed in Appendix B, Attachment A, Table 2.

"OBD Infrequent Regeneration Adjustment Factor" or "OBD IRAF" mean the additive or upward adjustment factor for each pollutant used to account for increased emissions caused by periodic regeneration of any aftertreatment device or strategies activated for monitoring faulty components of the control system in order to adjust the emissions results used to determine the malfunction criterion for monitors that are required to indicate a malfunction before emissions exceed the applicable emission threshold.

"OBD Noncompliance" means any of the following terms, as relevant in the context of the Paragraph: Pre-Approved OBD Noncompliances, Class 1 Additional OBD Noncompliances, Class 2 Additional OBD Noncompliances, Section 1968.5 OBD Noncompliances, or Unreported OBD Noncompliances.

"OBD Summary Table" means the table submitted by Defendants to EPA and CARB pursuant to Appendix B, Paragraph 4.a.i.E and that complies with the version of 13 C.C.R. § 1968.2(i)(2.2) applicable at the time of certification for the particular Model Year of a Subject Vehicle. For Emission Modification Categories 1 to 5 and 9, it must include a revised OBD Summary Table for the OBD Cluster associated with the Emission Modification Category that identifies in redline the changes in the OBD system from the certified configuration due to the proposed Emission Modification Configuration, or, if there are no material changes to the OBD system, it must provide a statement that there are no material changes and the basis for this conclusion. The revised OBD Summary Table for Emission Modification Categories 1 to 5 shall be in a format comparable to that

included in the revised OBD Summary Table for Emission Modification Category 9.

"Operable" means that a vehicle so described can be driven under its own engine power.

"Paragraph" means a portion of this Consent Decree or any Appendices attached hereto identified by an Arabic numeral. Unless a subsidiary Paragraph is otherwise specified, if a Paragraph is cross-referenced, the cross-reference shall include all subsidiary Paragraphs (*e.g.*, Paragraph 1, 1.a, 1.b, 1.b.i, 1.b.i.A, 1.c, *etc.*).

"Particulate Matter" or "PM" means particulates formed during the diesel combustion process and measured by the procedures specified in 40 C.F.R. Part 86, Subpart B.

"Particulate Matter Sensor" or "PM Sensor" means a sensor located in a vehicle's exhaust system which directly or indirectly measures Particulate Matter or related characteristics.

"Parties" means the United States, California, and Defendants.

"Passenger Vehicles" means the vehicles in Emission Modification Categories 4–12.

"Payment Transmittal Form" means the form provided by CARB to the addressee listed in Paragraph 10 after the Effective Date of this Consent Decree, to accompany payments made to CARB.

"Personal Information" means (1) information specifically identifying, by reference to name, initials, telephone number, fax number, email, unique position or office, home address, or identification number, an employee of Daimler AG or any of its subsidiaries, except a subsidiary that is incorporated in or has its principal place of business in the United States, and (2) specific information about the health or family status of such an employee. Personal Information shall not include: (1) any information that directly relates to a violation of the terms of this Consent Decree; (2) any information that an employee has agreed may be processed and transferred to Plaintiffs by Daimler AG or any of its subsidiaries as part of that individual's employment agreement, including any collective employment agreements that include such individual; or (3) any information that an employee has otherwise consented may be processed and transferred to Plaintiffs by Daimler AG or any of its subsidiaries.

"Plaintiffs" means the United States and California.

"Portable Emissions Measurement System" or "PEMS" means an emissions measurement system that complies with the field testing specifications of 40 C.F.R. Part 1065, Subpart J, and that measures emissions while a vehicle is driven on the road.

"Post-Settlement Audit Team" or "PSAT" mean the audit department, located within Corporate Audit, consisting of audit teams dedicated specifically to environmental compliance and tCMS, which will conduct internal audits under this Consent Decree.

"Pre-Approved OBD Noncompliance" mean the OBD Noncompliances described in Appendix B, Paragraph 2.f.i.A and Attachment L, and in Paragraph 53.c.i.

"Project Future" means the restructuring plan under which Daimler AG has become the publicly listed parent company of three legally independent entities— Mercedes-Benz AG (including business units Mercedes-Benz Cars and Mercedes-Benz Vans), Daimler Truck AG (including business units Daimler Trucks and Daimler Buses), and Daimler Mobility AG (formerly Daimler Financial Services AG). Daimler AG will perform governance, strategy, and management functions as well as provide Company-wide services.

"PVE" means production vehicle evaluation, which is testing conducted in accordance with the requirements of 13 C.C.R. § 1968.2(j) (2016), as modified by Appendix B.

"QA/QC Reports" or "Quality Assurance/Quality Control Reports" mean records describing actions, measures, and steps taken to ensure the reliability and validation of the data and testing conducted under Appendix B to this Consent Decree. For emissions and fuel economy testing conducted pursuant to Appendix B, the QA/QC Reports will document compliance with 40 C.F.R. Part 1066; for OBD testing conducted pursuant to Appendix B, the QA/QC Reports will document compliance with 40 C.F.R. Part 86.

"Quality Management Department" or "QM" means the department responsible for quality management at Daimler.

"Records" means all non-identical copies of all documents, records, reports, or other information (including documents, records, or other information in electronic form).

"Regeneration Mode" means the period of operation in which the ATS is operated at temperatures consistent with a DPF Regeneration Event and with a minimum temperature and minimum duration specified in the Updated AECD Document for Emission Modification Category 9.

"Remedy Period" has the meaning set forth in Appendix A, Paragraph 18.j.

"Research & Development Department(s)" or "R&D" or "R&D department" mean the research and development departments of Mercedes-Benz Cars and Mercedes-Benz Vans.

"Risk Assessment" means the annual processes to systematically identify and assess the respective compliance risks of all Daimler entities.

"SC03" means the emission test cycle described in Appendix I, Paragraph (h) (Dynamometer Schedules) of 40 C.F.R. Part 86 and the procedures set forth in 40 C.F.R. §§ 1066.810 and 1066.835.

"Secondary Emission Plus Test Vehicles" means one or more backup, or secondary, Emission Plus Test Vehicles for each Emission Modification Category that meet the requirements of Appendix B, Paragraph 1.c.

"Secondary OBD Demonstration Vehicles" means one or more backup, or secondary, OBD Demonstration Vehicles for each OBD Cluster that meet the requirements of Appendix B, Paragraph 1.c.

"Secondary Vehicles" means Secondary Emission Plus Test Vehicles and/or Secondary OBD Demonstration Vehicles.

"Section" means a portion of this Consent Decree identified by a capitalized Roman numeral.

"Section 1968.5 OBD Noncompliance" means the OBD Noncompliances described in Paragraph 53.c.iv.

"Selective Catalytic Reduction System" or "SCR System" means all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other elements of design that collectively constitute the system for controlling $NO_x$ emissions through catalytic reduction using an ammonia-based DEF as the reducing agent, including without limitation all hardware, components, parts, sensors, subassemblies, software, AECDs, calibrations, and other elements of design relating to (1) the DEF storage tank, (2) the DEF injectors, (3) the dosing control unit, and (4) the SCR catalyst assembly.

"Sprinters" means the vehicles in Emission Modification Categories 1–3.

"Standard Road Cycle" or "SRC" means the test cycle described in 40 C.F.R. Part 86, Appendix V.

"Statement of Position" means a written statement of position by any Party regarding a matter in dispute to be resolved through formal dispute resolution procedures pursuant to Paragraphs 72–75 of this Consent Decree.

"Subject Vehicles" means any vehicles identified in Appendix B, Attachment I that Defendants sold or offered for sale in, or introduced or delivered for introduction into commerce in the United States or its Territories, or imported into the United States or its Territories, and that are or were purported to have been covered by the EPA test groups and/or CARB test groups listed in Appendix B, Attachment I.

"Submission" means any plan, report, application, or other item that is required to be submitted for approval pursuant to this Consent Decree.

"Supervisory Board" means the corporate governance board of Daimler AG, which monitors and advises the BoM.

"tCMS Multiplier" means a contact person within R&D for technical compliance-related issues.

"tCMS R&D" or "tCMS R&D department" mean the dedicated tCMS units established within R&D (both Mercedes-Benz Passenger Cars and Vans). Both of these units report directly to the respective heads of the R&D departments.

"tCMS Risk Assessment" means the annual Risk Assessment conducted for technical product compliance risks, designed to measure the technical product compliance and environmental risk exposure of R&D departments, and identify the specific risks existing within each of those departments. The tCMS Risk Assessment is conducted by IL/P.

"Technical Compliance Committee" or "TCC" means the committee consisting of mainly E2-level representatives from IL/P, R&D, Certification, tCMS R&D, Communications, and External Affairs, which participates in the cross-functional decision-making process and considers Clearing Cases.

"Technical Compliance Management System" or "tCMS" means Daimler's technical compliance management system, consisting of values, principles, structures, and processes that have the primary objective of addressing all significant technical and environmental risks arising during the product life cycle, including risks related to emissions and certification.

"Test Group" means the basic classification unit within a durability group as determined under 40 C.F.R. § 86.1827-01, used for the purpose of demonstrating compliance with exhaust emission standards in accordance with 40 C.F.R. § 86.1841-01.

"Test Protocol" means Appendix B and all Attachments thereto.

"Test Vehicles" mean vehicles that meet the requirements of Appendix B, Paragraphs 1.a–1.c and Appendix B, Attachment A, and that are tested pursuant to Appendix B.

"THC" means total hydrocarbons.

"Transmission Control Unit" or "TCU" means the electronic hardware device, together with the software and calibrations installed on the device, that controls the operation of the transmission in the Subject Vehicles.

"Ultra Low Emission Vehicle" or "ULEV" means any vehicle certified by CARB as meeting CARB ultra-low-emission vehicle standards, either under 13 C.C.R. § 1961(a)(1) for 2004 through 2019 vehicles certified under the California LEV II exhaust emission standards, or under 13 C.C.R. § 1961.2(a)(1) for 2015 and subsequent model year vehicles certified under the California "LEV III" exhaust emission standards.

"Unified Drive Cycle" or "UDC" means the "Unified Cycle Driving Schedule" defined in Part II of the "California 2015 and Subsequent Model Criteria Pollutant

Exhaust Emission Standards and Test Procedures and 2017 and Subsequent Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light Duty Trucks, and Medium Duty Vehicles," incorporated by reference in 13 C.C.R. § 1961.2.

"United States" means the United States of America, acting on behalf of EPA.

"United States/California" means the United States and California jointly, or the United States or California, as applicable.

"United States/CARB" means the United States and CARB jointly, or the United States or CARB, as applicable.

"Unreported OBD Noncompliance" means the OBD Noncompliances described in Paragraph 53.c.iii.

"Updated AECD Document" means the document that meets the requirements of Appendix B, Paragraph 4.a.ii.

"U.S. Complaint" means the complaint filed by the United States in this action on September 14, 2020.

"Urban/Downtown Los Angeles Route" means the driving route shown and described in Appendix B, Attachment D.

"US06" means the emission test cycle described in Appendix I, Paragraph (g) (Dynamometer Schedules) of 40 C.F.R. Part 86 and the procedures set forth at 40 C.F.R. §§ 1066.810 and 1066.831.

"VIN" means vehicle identification number, as defined in 49 C.F.R. § 565.12(r).

"WAL" means worst acceptable limit as set forth in 13 C.C.R. § 1968.2(h)(6.4.1) (2016).

"Warrantable Failure" has the meaning set forth in Appendix A, Paragraph 18.j.

## IV.    CIVIL PENALTY

8.      Within 30 Days after the Effective Date, Defendants shall pay the total sum of $875,000,000 as a civil penalty, together with interest accruing from the Date of Lodging at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging. Defendants are jointly and severally liable for payment of the sum in the prior sentence.

9.      Of the amount set forth in Paragraph 8, Defendants shall pay $743,750,000, plus the interest due thereon, to the United States, by FedWire Electronic Funds Transfer to the U.S.

Department of Justice account, in accordance with instructions provided to Defendants by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the District of Columbia after the Effective Date. The payment instructions provided by the FLU will include a CDCS number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Daimler AG
> z. H. Kurt Schäfer
> Werk 096, HPC Z300
> 70546 Stuttgart, Germany
> Email: kurt.schaefer@daimler.com
> Phone: +49 711 17-92203
>
> Daimler AG
> z. H. Frank Wetter
> Werk 096, HPC Z304
> 70546 Stuttgart, Germany
> Email: frank.wetter@daimler.com
> Phone: +49 711 17-92945

on behalf of Defendants. Defendants may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XVI (Notices).

At the time of payment, Defendants shall send notice that payment has been made: (1) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (2) to the United States via email or regular mail in accordance with Section XVI (Notices); (3) to EPA in accordance with Section XVI (Notices); and (4) to CBP via email in accordance with Section XVI (Notices). Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Daimler AG et al.*, and it shall reference Civ. No. 1:20-cv-2564 the CDCS Number, and DJ # 90-5-2-1-11788.

10.     Of the amount set forth in Paragraph 8, Defendants shall pay $131,250,000, plus the interest due thereon, to CARB by check, accompanied by a Payment Transmittal Form (which CARB will provide to the addressee listed in Paragraph 9 after the Effective Date), with the check mailed to:

> California Air Resources Board
> Accounting Office
> P.O. Box 1436
> Sacramento, CA 95812-1436;

or by wire transfer, in which case Defendants shall use the following wire transfer information and send the Payment Transmittal Form to the above address prior to each wire transfer:

> State of California Air Resources Board
> c/o Bank of America, Inter Branch to 0148
> Routing No. 0260-0959-3; Account No. 01482-80005
> Notice of Transfer: Accounting; Fax: (916) 322-9612
> Reference: CARB Case #C00032.

Defendants are responsible for any bank charges incurred for processing wire transfers, and for replacing any checks due to a check bouncing or being lost in the mail. Penalties paid to CARB under this Consent Decree shall be deposited into the Air Pollution Control Fund for the purpose of enhancing CARB's mobile source emissions control program through additional certification review, in-use evaluation, real-world testing, enforcement actions, and other CARB activities related to the control of air pollution.

11.     Defendants shall not deduct any penalties paid under this Consent Decree pursuant to this Section IV (Civil Penalty) or Section X (Stipulated Penalties) in calculating their U.S. federal, state, or local income tax.

V.     APPROVAL OF SUBMISSIONS; U.S./EPA/CARB DECISION-MAKING

12.     For purposes of this Consent Decree, unless otherwise specified in this Consent Decree:

      a.     with respect to any Submission, other obligation that requires approval or other decision by Plaintiffs, or force majeure claim of Defendants that concerns Section VI (Subject Vehicle Compliance) or that concerns Appendix B, EPA/CARB or the United States/CARB shall issue a joint or sole decision, as applicable, concerning the Submission, other obligation, or force majeure claim;

      b.     with respect to any Submission, other obligation that requires approval or other decision by Plaintiffs, or force majeure claim of Defendants that concerns Section VIII (Mitigation), EPA or the United States shall issue a decision concerning the Submission, other obligation, or force majeure claim;

      c.     with respect to any other Submission, obligation that requires approval or decision by Plaintiffs, or force majeure claim of Defendants under this Consent Decree, the position of EPA or the United States, after consultation with CARB, shall control.

13.     Except as otherwise specified after review of any Submission, EPA/CARB or the United States/CARB shall in writing: (1) approve the Submission; (2) approve the Submission upon specified conditions; (3) approve part of the Submission and disapprove the remainder; or (4) disapprove the Submission. In the event of an approval upon specified conditions or a disapproval, in full or in part, of any portion of the Submission, if not already provided with the EPA/CARB or the United States/CARB written decision, upon the request of Defendants, EPA/CARB or the United States/CARB will provide in writing the reasons for such specified conditions or disapproval.

14.     If the Submission is approved pursuant to (1) in Paragraph 13 above, Defendants shall take all actions required by the Submission, in accordance with the schedules and requirements of the Submission, as approved. If the Submission is conditionally approved or approved only in part pursuant to (2) or (3) in Paragraph 13 above, Defendants shall, upon written direction from EPA/CARB or the United States/CARB, take all actions required by the Submission that EPA/CARB or the United States/CARB determine(s) are technically severable from any disapproved portions, subject to Defendants' right to dispute only the conditions EPA/CARB or the United States/CARB specified or the disapproved portions, under Section XII (Dispute Resolution).

15.     If the Submission is disapproved, in whole or in part pursuant to (3) or (4) in Paragraph 13 above, Defendants shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the Submission, or disapproved portion thereof, for approval, in accordance with Paragraph 13. If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with Paragraph 14.

16.     If a resubmitted Submission is disapproved, in whole or in part, EPA/CARB or the United States/CARB may again require Defendants to correct any deficiencies, in accordance with Paragraph 15; or EPA/CARB or the United States/CARB may itself/themselves correct any deficiencies, and Defendants shall implement the Submission as modified by EPA/CARB or the United States/CARB, subject to Defendants' right to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution) and the right of EPA/CARB or the United States/CARB to seek stipulated penalties.

17.     Any stipulated penalties applicable to the original Submission, as provided in Section X (Stipulated Penalties), shall accrue during the 45-Day period or such other time as the

Parties agreed to in writing pursuant to Paragraph 15, but shall not be payable unless the resubmission of the original Submission is untimely or is disapproved in whole or in part; provided that, if EPA or the United States, in consultation with CARB, determines that the original Submission was so deficient as to constitute a material breach of Defendants' obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission. In the event that EPA or the United States seeks stipulated penalties under this Paragraph, upon request of Defendants, EPA or the United States will provide in writing the reasons for such a finding of material deficiency, if not already provided with the EPA/CARB or United States/CARB written decision.

## VI.    SUBJECT VEHICLE COMPLIANCE

18.    Emission Modification Program. The Parties shall implement the Emission Modification Program in accordance with the requirements set forth in Appendix A.

      a.    Related Class Action Settlement. If the United States and CARB find and provide notice in writing to Defendants that provisions in a related Class Action Settlement are equivalent to the requirements of Appendix A, Paragraphs 1, 8–12, 15–16, 18, and 19 and Paragraphs 53.b.i–53.b.iii, 53.b.v (except with respect to Dealer Emissions Modification Disclosures), 53.b.viii, and 53.b.ix.A of this Consent Decree, Defendants shall be relieved of those obligations under this Consent Decree without further amendment to this Decree or action by the Court. All other terms of this Consent Decree shall remain in force and effect.

      b.    Paragraph 18.a shall apply only if a United States district court grants a

motion for preliminary approval of the Class Action Settlement. Defendants shall abide by the terms of this Consent Decree if (1) a United States district court denies with prejudice a motion for final approval of the Class Action Settlement; or (2) the equivalent provisions in the Class Action Settlement are not included in the court's final approval order or are delayed, reversed, or vacated by an appellate court for any reason, even if the United States and CARB provided notice to Defendants pursuant to Paragraph 18.a before an event described in (1) or (2) of this sentence occurs.

c.      If the requirements found in Paragraphs 18.a and 18.b are satisfied, and notice provided accordingly, Defendants are relieved of any obligations found in Paragraphs 53.b.i–53.b.iii, 53.b.v (except with respect to Dealer Emissions Modification Disclosures), 53.b.viii, and 53.b.ix.A of this Consent Decree specified in that notice without further amendment to this Decree or action by the Court.

19.     <u>Subject Vehicle In-Use Testing</u>.

a.      <u>OBD In-Use Monitoring Performance Verification and Reporting</u>. Using a contractor or Dealer, Defendants shall collect and report in-use monitoring performance data as required by 13 C.C.R. § 1968.2(j)(3) (2016) (*i.e.*, verification and reporting of in-use monitoring performance) from 15 vehicles from each of Emission Modification Categories 1, 2, 3, 4, 5, and 9, and 5 vehicles from each of Emission Modification Categories 6, 7, 8, 10, 11, and 12 that has received the Approved Emission

Modification, within 360 Days after the first Eligible Vehicle from each Emission Modification Category is modified in accordance with Appendix A. Vehicles shall be selected, for the purposes of this Paragraph only, in accordance with 13 C.C.R. § 1968.2(j)(3) (2016) and 13 C.C.R. § 1968.5(b)(3)(D)(ii) (2016).

b.   In-Use Emission Standard Testing. Defendants shall undertake and complete in-use testing pursuant to this Paragraph 19.b. Defendants shall test according to the following schedule: (1) For Emission Modification Category 1 (also known as In-Use Group 1), begin testing no later than one year after the Effective Date, or one year after the date of approval of the Category 1 Emission Modification in accordance with Appendix B, Paragraph 5, whichever is later, and test each year thereafter; (2) for Emission Modification Category 9, begin testing no later than one year after the Effective Date, or one year after the date of approval of the Category 9 Emission Modification in accordance with Appendix B, Paragraph 5, whichever is later, and for each year thereafter, test from one of Defendants' choice of one of Emission Modification Categories 9, 10, 11, and 12 (collectively, also known as In-Use Group 2); (3) for Emission Modification Category 3 (also known as In-Use Group 3), begin testing no later than one year after the Effective Date, or one year after approval of the Category 3 Emission Modification in accordance with Appendix B, Paragraph 5 , whichever is later, and for each year thereafter; (4) for Defendants' choice of one of Emission Modification Categories 4 and 5

30

(collectively, also known as In-Use Group 4), begin testing no later than one year after the Effective Date, or one year after approval of the Category 4 Emission Modification in accordance with Appendix B, Paragraph 5, whichever is later, and for each year thereafter; and (5) for Defendants' choice of one of Emission Modification Categories 7 and 8 (collectively, also known as In-Use Group 5), begin testing no later than one year after the Effective Date, or one year after approval of the Category 7 Emission Modification in accordance with Appendix B, Paragraph 5, whichever is later, and for each year thereafter. Defendants shall undertake and complete in-use emission standard testing in accordance with the requirements of this Paragraph 19.b. Within 9 to 12 months from the Effective Date, and each year thereafter for five years from the Effective Date, Defendants shall repeat the in-use testing required under this Paragraph, except for Subject Vehicles that are the subject of a determination of non-compliance issued pursuant to Paragraph 19.b.v.

i.      In-Use Verification Testing and Vehicle Selection. Defendants shall select no less than two Subject Vehicles for each Emission Modification Category that have been updated with the Approved Emission Modification for in-use verification testing that meet the requirements of Appendix B, Paragraph 1.b. Defendants may not exclude Subject Vehicles from being selected for in-use verification testing based solely upon the lack of maintenance

records or a history of multiple owners or repairs. Each Subject Vehicle shall have between 100,000 and 110,000 miles, and each Subject Vehicle shall have been driven no less than 1,500 miles since receiving the Approved Emission Modification. If Defendants are unable to find such a Subject Vehicle, Defendants may select a Subject Vehicle with mileage no less than 50,000 miles and no greater than 119,000 miles and driven no less than 1,500 miles since receiving the Approved Emission Modification. Defendants shall use best reasonable efforts to select a high mileage vehicle using the criteria above. In selecting vehicles for In-Use Groups 2, 4, and 5, which are comprised of different Emission Modification Categories, Defendants shall select and test a vehicle from a different Emission Modification Category than that selected for in-use testing in the prior year, provided such a vehicle can be acquired within the aforementioned mileage range. In addition, in the case of In-Use Group 4, Defendants shall select and test a different Model within the chosen Emission Modification Category than the Model selected for in-use testing in the prior year, provided such a vehicle can be acquired within the aforementioned mileage range. If Defendants cannot procure a high mileage vehicle, Defendants shall select and test a vehicle from the same Emission Modification Category as that selected for in-use testing in the prior year, and Defendants shall describe all

efforts made to procure such a vehicle and explain why it could not be reasonably procured under Paragraph 42.b (In-Use Testing). Vehicles that meet the requirements of this Paragraph shall be known as the "IUVT Vehicles."

A.   <u>Evaluation of In-Use Verification Testing</u>.  On each of the IUVT Vehicles selected for in-use verification testing in accordance with Paragraph 19.b.i, above, Defendants shall conduct emissions tests pursuant to Paragraph 19.b.iii.  If, after applying any IRAFs, but not any Deterioration Factors, that applied at the time of certification, either of the IUVT Vehicles exceeds the Emission Standard specified in Appendix B, Attachment I, and the average emissions of IUVT Vehicles tested is equal to or greater than 115 percent of the Emission Standard as a result of the testing specified in Paragraph 19.b.iii.A, Defendants shall undertake in-use confirmatory testing in accordance with Paragraph 19.b.ii.  For purposes of calculating SFTP composite emission levels, Defendants shall include the IUVP FTP emissions, the IUVP US06 emissions, and the values from the SC03 test reported in the Emission Modification Proposal Report, or in the case of In-Use Group 3, the values from the MY20 certification application, if applicable.  If more than one set of SC03

data exists, Defendants shall choose the SC03 result to use in the calculation from among those data sets using good engineering judgment. The calculations shall be made using the equations prescribed in 40 C.F.R. § 86.164.

ii.   In-Use Confirmatory Testing and Vehicle Selection. Within 20 Days of submitting in-use verification test results that meet the criteria for in-use confirmatory testing set forth in Paragraph 19.b.i.A, Defendants shall submit to EPA/CARB for review and approval an in-use confirmatory test plan (the "IUCP") to test other Subject Vehicles within the same Emission Modification Category as the IUVT Vehicles that triggered the IUCP. Defendants' IUCP Vehicles shall comply with the requirements of Appendix B, Paragraph 1.a and Paragraph 1.b, 40 C.F.R. § 86.1846-01(i), and must meet the requirements of Paragraph 19.b.i. The vehicles specified in IUCP shall be known as the "IUCP Vehicles." Defendants shall commence testing under the IUCP no later than 90 Days from the Day EPA/CARB approve the IUCP, and shall complete testing under the IUCP within 210 Days from the Day EPA/CARB approve the IUCP. The approved IUCP shall only require Defendants to conduct emissions tests in accordance with Paragraph 19.b.iii.

A.   Evaluation of In-Use Confirmatory Testing. If, after applying any IRAFs, but not any Deterioration Factors, that

34

applied at the time of certification, any IUCP Vehicle exceeds the Emission Standard specified in Appendix B, Attachment I for the tests conducted pursuant to Paragraph 19.b.iii.A, Defendants shall conduct an evaluation to determine the reason(s) for the failure. Defendants shall submit a report of their findings to EPA/CARB no later than 90 Days from conclusion of the IUCP. EPA/CARB may agree, in writing, to extend this deadline.

iii.    <u>Emissions Tests, Data Collection</u>.

A.    For each IUVT Vehicle and any IUCP Vehicle, Defendants shall conduct FTP75 and HWFET emissions tests in accordance with Appendix B, Paragraph 2.b.i. In addition, for each IUVT Vehicle and any IUCP Vehicle in In-Use Groups 2, 4, and 5, Defendants shall conduct US06 emissions tests in accordance with Appendix B, Paragraph 2.b.i. For each IUVT Vehicle and any IUCP Vehicle in In-Use Group 3, Defendants shall conduct a modified US06 emissions test in accordance with 13 C.C.R. § 1961.2. All testing conducted pursuant to this Paragraph shall conform to the requirements of 40 C.F.R. Part 86, as modified by Appendix B, and conformity with 40 C.F.R. Part 1066 shall not be required.

B.      Defendants shall also perform special cycle and PEMS emissions tests under Appendix B, Paragraphs 2.b.i and 2.b.ii on each IUVT for the first, third, and fifth year of testing required under Paragraph 19.b, and on any IUCP vehicle, provided that the results of special cycle and/or PEMS testing conducted under this Paragraph cannot be the basis for determining a failure to meet the Emission Standard for in-use verification testing pursuant to Paragraph 19.b.i.A, or for determining a failure of in-use confirmatory testing pursuant to Paragraph 19.b.ii.A. Notwithstanding the foregoing, special cycle and PEMS emissions tests pursuant to this Paragraph shall not be required for In-Use Group 1. All testing conducted pursuant to this Paragraph shall conform to the requirements of 40 C.F.R. Part 86, as modified by Appendix B, and conformity with 40 C.F.R. Part 1066 shall not be required.

C.      Prior to EPA or CARB taking any action, including the assessment of stipulated penalties, based on the results of special cycle and/or PEMS emissions tests conducted on in-use vehicles, whether such testing was conducted by Defendants or by EPA/CARB, EPA/CARB must notify Defendants in writing of such planned action. If the in-use

testing was conducted by EPA and/or CARB, the testing agency shall concurrently provide Defendants with all available data, including but not limited to the ECU data and modal emissions data, for all testing conducted on vehicles in that In-Use Group.  Thereafter, the parties must have a meet-and-confer period of no less than 60 Days to discuss the special cycle and/or PEMS emissions test results before any stipulated penalty can be assessed or any other action can be taken.

D.    For all tests conducted under this Paragraph 19.b.iii, Defendants shall collect data from such tests in accordance with Appendix B, Paragraphs 4.a.v, 4.a.vi, 4.a.vii, 4.a.xvi, and 4.a.xvii, except that the requirement to collect ECU data in Appendix B, Paragraphs 4.a.vi and 4.a.vii shall not apply and instead, Defendants shall collect ECU data in accordance with the procedures outlined in Appendix C. Additionally, for all tests conducted under Paragraph 19.b.iii, in accordance with 13 C.C.R. § 1968.2 (2016), Defendants shall collect all downloads of all standardized OBD data from the tested vehicles, both before and after conducting each test required by Paragraphs 19.b.i and 19.b.ii, except that for PEMS testing, if more than one PEMS route is conducted in a single day, the downloads

shall be conducted before the start of the first PEMS route
and after the end of the final PEMS route on that day when
the vehicle has returned to Defendants' testing facility.

iv.    FUL Limitation.   Defendants are not required to test any vehicle
with mileage beyond its FUL.

v.    EPA/CARB Options Following IUCP Testing Failure.   Upon
receipt and consideration of a report pursuant to Paragraph
19.b.ii.A, EPA/CARB shall, in writing: (1) determine that no
further action is required, (2) issue a Determination of In-Use Non-
Compliance due to failure of the Approved Emission Modification
and may assess stipulated penalties pursuant to Paragraph 53.d.iii
(Failure to Comply with Emission Standards), and/or (3) issue a
Determination of In-Use Non-Compliance and follow their
regulatory procedures for determining whether to implement a
recall under 40 C.F.R. Part 85, Subpart S, and 13 C.C.R. §§ 2113
and 2123 or take other appropriate actions under their respective
regulations with respect to all Subject Vehicles identified in the
Determination of In-Use Non-Compliance.   Any administrative
action under (3) in the preceding sentence in this Paragraph 19.b.v
shall not be subject to review under Section XII (Dispute
Resolution) of this Consent Decree. If Defendants miss the
applicable deadline to submit a report pursuant to Paragraph
19.b.ii.A, EPA/CARB may issue a Determination of In-Use Non-

Compliance without waiting to receive such report from Defendants. Additionally, notwithstanding any other provision of this Consent Decree including Paragraph 86 and Paragraph 87. (concerning effect of settlement), the United States and California reserve all equitable rights to address any non-compliance identified in the Determination of In-Use Non-Compliance under applicable laws and regulations by instituting proceedings in this action or in a new action and/or by pursuing administrative remedies.

vi.   Notification of Testing. Defendants shall notify EPA/CARB at least 15 Days prior to commencing testing in accordance with Paragraph 19.b.i.A (In-Use Verification Testing), Paragraph 19.b.ii (In-Use Confirmatory Testing), and, as applicable, Paragraph 19.b.ii.A (Evaluation of In-Use Confirmatory Testing) so that EPA/CARB may observe the testing.

c.   Reporting. In-use testing under Paragraph 19.a and 19.b.i shall be reported in the next semi-annual report, in accordance with Paragraph 42.b (In-Use Testing). In-use testing under Paragraphs 19.b.ii and 19.b.ii.A shall be reported in accordance with those subparagraphs. If any IUVT Vehicle or IUCP Vehicle in an Emission Modification Category fails the Emission Standard specified in Appendix B, Attachment I, Defendants shall notify the persons designated in Section XVI (Notices) for EPA/CARB within 72 hours of such event.

d.      <u>Publication of Data</u>. For any IUVT Vehicle, within 30 Days of submitting the applicable semi-annual report, Defendants shall post an emissions test report containing the bag results, and all second-by-second modal (continuous) emissions data for NOx, total hydrocarbons, carbon monoxide, carbon dioxide, and non-methane hydrocarbons for each emissions test required pursuant to Paragraph 19.b.iii.A, and each test required by Paragraph 19.b.iii.B, on the public website required by Appendix A, Paragraph 16. For any IUCP Vehicle, within 30 Days of receipt of the EPA/CARB written response pursuant to Paragraph 19.b.v, Defendants shall post an emissions test report containing the bag results, and all second-by-second modal (continuous) emissions data for NOx, total hydrocarbons, carbon monoxide, carbon dioxide, and non-methane hydrocarbons for each emissions test required pursuant to Paragraph 19.b.iii.A, and each test required by Paragraph 19.b.iii.B, on the public website required by Appendix A, Paragraph 16. Defendants shall provide the modal (continuous) emissions data specified in this Paragraph in a format that can be imported into a spreadsheet. Defendants shall not be required to post, pursuant to this Paragraph, any data that has been invalidated pursuant to Appendix B, Paragraph 2.a.iv. The Parties agree and acknowledge that neither United States nor California law sets forth a standard by which PEMS and off-cycle dynamometer testing can be used to determine compliance for purposes of certification under Title II of the Clean Air Act.

## VII.    CORPORATE COMPLIANCE

20.    Defendants shall undertake the Corporate Compliance provisions of this Consent Decree in conjunction with their existing corporate and compliance management activities with the goal to:

      a.    Prevent environmental compliance problems related to United States or California environmental laws and regulations from arising in the first instance;

      b.    Detect any environmental compliance problems related to United States or California environmental laws and regulations that do arise; and

      c.    Respond to any environmental compliance problems related to United States or California environmental laws and regulations that arise, including modifying broader policies, processes, controls or any other activities that allowed the problem to arise, and self-disclose, as appropriate, to EPA and CARB where disclosure should have occurred in the first instance.

To meet the goals of this Section VII, Defendants have designed the measures described in Paragraphs 28–30 to target compliance with United States and California laws and regulations governing light- and medium-duty vehicle emission and certification.

21.    Defendants have developed and are continuing to implement and enhance existing various corporate governance policies and practices in the areas of integrity, business ethics, and environmental compliance. Defendants describe these policies and practices in their Operating Plan for Technical and Environmental Product Compliance ("Compliance Operating Plan"), attached hereto as Appendix D. These efforts include: (1) compliance-related corporate

organizations; (2) a compliance management system ("CMS") to detect and address Company-wide compliance risks; (3) a technical compliance management system ("tCMS"), which focuses specifically in part on vehicle environmental compliance; (4) technical compliance and certification control measures to detect and address Company-wide vehicle environmental compliance risks; and (5) external communication of Daimler's compliance efforts. Defendants will conduct both (1) internal audits and (2) a third-party review to evaluate these efforts.

22.     Defendants shall implement both the policies and practices contained in their Compliance Operating Plan and the requirements contained in this Section VII (Corporate Compliance).

23.     Segregation of Duties. Defendants shall maintain the separation of individuals and organizational units within the company that deal with: vehicle certification; vehicle research and development; and internal corporate audits. Each of these organizational units shall primarily report to a different Board of Management member.

24.     Integrity Code. Defendants have modified their Integrity Code's environmental protection and technical compliance provisions to emphasize the reduction of air emissions and the improvement of air quality by, in part, emphasizing compliance with environmental laws and regulations. By September 30, 2020, Defendants shall inform and train their employees regarding the modified Code.

25.     Employee Discipline and Compensation. Defendants shall continue to factor environmental compliance into the integrity factor for the variable compensation structure of their relevant middle- and senior-level managers, and shall periodically assess any additional adjustments to how this compliance factors into compensation. Defendants shall continue to

subject employees who violate any environmental compliance requirement to appropriate internal disciplinary measures.

26.    Whistleblower System.

a.    Defendants shall continue to implement their existing Business Practices Office ("BPO") (their whistleblower office) to report, investigate, and mitigate any environmental compliance issues. Defendants' BPO shall continue to be centralized and available to all of Defendants' employees, and shall maintain the ability to report anonymously in Germany and the United States, and otherwise as permitted by local law, possible environmental compliance issues. Employees in Germany shall continue to have the option to make reports to the Neutral Intermediary, an independent external attorney, who shall be available to receive and forward anonymous BPO reports.

b.    Defendants have trained the BPO Neutral Intermediary on vehicle emissions and certification compliance issues and have provided the Intermediary with an independent tCMS expert contact point to clarify vehicle emissions and certification compliance questions. Defendants' BPO Neutral Intermediary has participated in an expert-level dialogue with IL/P and an external technical expert regarding vehicle emissions and certification compliance risks.

c.    By December 31, 2020, Defendants shall clarify in their Treatment of Violations Policy used by the BPO, and in related training, that environmental noncompliance of a product within the United States

always constitutes "serious risk."

d.      Defendants have formalized and documented the requirement that BPO
        employees assigned to review any reported potential environmental
        compliance violation discuss the reported violation with the head of the
        BPO in person.

e.      Defendants have launched a communication campaign within research and
        development ("R&D") to promote the BPO. This campaign shall last until
        at least December 31, 2021.

f.      By December 31, 2020, Defendants shall test and measure the actual reach
        of the communication campaign by way of a dedicated anonymous survey
        among all addressed audiences. The survey's results shall be used for
        further development of additional communication and improvement of the
        BPO.

g.      Defendants have fully implemented an embedded IT system control that
        ensures that a BPO case cannot be closed without review by at least two
        BPO employees.

27.     Risk Assessment. Defendants shall continue to perform their annual compliance
Risk Assessment. Defendants shall complete their compliance Risk Assessment for 2019, and
shall assign any mitigating measures by December 31, 2019. Defendants shall complete
compliance Risk Assessments by December 31 of every year for the duration of this Consent
Decree. Defendants shall implement any mitigation measures assigned to address compliance
risks and shall track completion of new mitigation measures for material risks, including risks

related to compliance with U.S. and California laws and regulations governing vehicle emissions and certification.

28.   <u>Business Partner and Supplier Integrity Management</u>.

a.   As described in this Paragraph 28, Defendants shall continue to evaluate their business partners' environmental compliance and the effects that those partners' compliance could have on Defendants' own environmental compliance. For purposes of this Section VII (Corporate Compliance), unless otherwise specified herein, "suppliers" shall refer to suppliers which Defendants have a contractual relationship with and which directly provide to Defendants Emission-Related software, Emission-Related software calibrations, or Emission-Related hardware parts for use in vehicles intended for certification in the United States or California.

b.   Defendants have enhanced their screening process to identify suppliers that have potentially violated environmental regulatory requirements.

c.   By December 31, 2020, Defendants shall enhance the general terms and conditions in their standard supplier contracts to include an explicit requirement to comply with technical regulations and laws, which include laws and regulations governing vehicle emissions and certification, and will undertake reasonable best efforts to include the requirement to comply with technical regulations into contracts entered into with suppliers. Defendants shall undertake reasonable best efforts to include a requirement in supplier contracts to document or notify Defendants in writing when the supplier determines that the supply of an Emission-

Related part or performance of an Emission-Related service will result in Defendants violating U.S. or California vehicle emissions or certification regulations or laws, except where deficiencies under 13 C.C.R. §§ 1968.2 or 1968.5 may be permitted with appropriate disclosure to EPA or CARB.

d.      Defendants shall undertake reasonable best efforts to have its suppliers include in their contracts entered into with other suppliers that provide Emission-Related software, Emission-Related software calibrations, and/or or Emission-Related hardware parts for the ultimate use by Defendants in vehicles intended for certification in the United States or California terms that require these suppliers to document or notify the Defendants' direct supplier in writing when it determines that the supply of an Emission-Related part or performance of an Emission-Related service will result in Defendants violating U.S. or California vehicle emissions or certification regulations or laws, except where deficiencies under 13 C.C.R. §§ 1968.2 or 1968.5 may be permitted with appropriate disclosure to EPA or CARB.

e.      From June 30, 2020, onward, Defendants shall establish and maintain a list of suppliers that provide an Emission-Related part or Emission-Related service that, to Defendants' knowledge, result in Defendants violating U.S. or California vehicle emissions or certification regulations or laws, except where deficiencies are permitted with appropriate disclosure to EPA or CARB. Additionally, Defendants shall include on such a list suppliers that have been found by a governmental

environmental agency to have violated U.S. or California vehicle emissions or certification regulations or laws in an administrative agreement, consent decree, settlement agreement, or other formal judgment or adjudication. Such list shall identify both the supplier of the Emission-Related parts or service and the individual Emission-Related part or service which resulted in the violation.

f.      By December 31, 2019, Defendants shall update their Compliance Awareness Module ("CAM") for sales business partners that sell Defendants' vehicles or vehicle parts ("Sales Business Partners") to include information for those Sales Business Partners on environmental compliance topics and contact information for Defendants' BPO.

    i.      By December 31, 2019 Defendants shall begin rollout of the updated CAM to Sales Business Partners.

    ii.     By December 31, 2020 Defendants shall implement an automatic CAM invitation process for every new Sales Business Partner.

    iii.    Defendants have implemented an automatic CAM invitation process for every new supplier.

g.      By December 31, 2019, Defendants shall identify relevant suppliers that are supplying Emission-Related parts or services to "High-risk" departments (according to the tCMS Risk Assessment described in Paragraph 29.e) and shall provide to those suppliers an additional tCMS awareness presentation.

h.      Defendants have identified and conducted an in-person workshop with

suppliers that provide products or services directly relating to compliance with United States or California vehicle emissions or certification laws or regulations, to detail Defendants' expectations regarding environmental compliance.

i. By June 30, 2020 Defendants shall establish environmental compliance-related communications and escalation processes with suppliers that provide products or services directly relating to compliance with United States or California vehicle emissions or certification laws or regulations, and, by June 30, 2020, Defendants shall develop and provide a platform and guidance for these suppliers to evaluate their own environmental compliance systems and Emission-Related development processes.

j. By December 31, 2019, Defendants shall develop and begin providing specific web-based training on United States and California vehicle emissions and certification laws and regulations to suppliers that provide products or services directly relating to compliance with United States or California vehicle emissions or certification laws and regulations.

29. Compliance Management System and Technical Compliance Management System.

a. Defendants shall continue to implement and evaluate both their corporate-wide CMS and their tCMS to prevent, detect, and respond to information that may lead to issues regarding environmental compliance.

b. By December 31, 2019, and annually thereafter, Defendants shall conduct a CMS effectiveness evaluation.

c.      By December 31, 2019 and annually thereafter, Defendants shall conduct a tCMS effectiveness evaluation, that includes, among other things, interviews of relevant employees, self-assessments, and evaluation of feedback received through consultation channels such as the tCMS multiplier network or via the BPO, which provides a channel for employees to provide anonymous feedback that may be relevant to the Effectiveness Evaluation, to determine if the tCMS program elements are designed and implemented effectively and, if they are not, to assign measures to improve the tCMS program. All tCMS effectiveness evaluations will be presented to the Compliance Board, the Group Risk Management Committee, the Board of Management ("BoM"), and the Audit Committee of the Supervisory Board.

d.      tCMS Training.

   i.      Defendants have required face-to-face tCMS training of all relevant existing employees within R&D departments. Defendants shall require face-to-face tCMS training with all relevant new employees within R&D departments. Defendants have implemented web-based tCMS training and shall require ongoing web-based tCMS training with relevant existing and new R&D employees.

   ii.      By December 31, 2019, and annually thereafter, Defendants shall provide specific mandatory training on United States and California emissions and certification regulations and laws,

including OBD, AECDs, and defeat devices to relevant R&D department employees. Defendants shall, on a risk basis, periodically evaluate which employees should receive this training.

iii. Defendants have distributed their AECD Documentation Guidelines to all Certification and R&D department employees that deal with these issues, and shall continue to annually distribute their AECD Documentation Guidelines to all Certification and R&D department employees that deal with these issues.

e. <u>tCMS Risk Assessment and Control Objectives</u>.

i. By December 31, 2019, and annually thereafter, Defendants shall conduct an annual tCMS Risk Assessment that includes, among other things, evaluation of feedback regarding environmental compliance risks and suggested improvements provided via established consultation channels such as the tCMS multiplier network, and/or via the BPO, to measure the risk exposure of R&D departments. By December 31, 2020, Daimler shall include in the tCMS Risk Assessment survey a statement inviting anonymous feedback through the BPO. As part of these tCMS Risk Assessments, Defendants shall assign mitigating measures. As part of the tCMS Risk Assessment process, Defendants shall conduct sample checks of mitigation measures to evaluate the effectiveness of mitigation measures and annually update the

tCMS Risk Assessment to improve the identification of risks and the completion of mitigation measures.

ii.     In conjunction with each annual tCMS Risk Assessment beginning with the 2020 calendar year, Defendants shall determine the effectiveness of prior year Assessments, and refine the following year Assessment based on this determination.

iii.    By December 31, 2019, and annually thereafter, Defendants shall identify tCMS control objectives to monitor processes used for environmental and technical compliance including detecting and disclosing AECDs and detecting and preventing defeat devices, and shall, as part of the Effectiveness Evaluation process, evaluate whether the objectives are being met.

30.     Technical Compliance and Certification Control Measures.

a.     Regulatory Monitoring Meeting.  By December 31, 2019, and quarterly thereafter, Defendants shall hold cross-functional Regulatory Monitoring Meetings in which Defendants shall aggregate developments on emerging United States or California emissions laws and regulations from various inputs and provide one consolidated source of information that is distributed on a management level within R&D departments.

b.     Enhanced Regulatory Database.  By December 31, 2021, Defendants shall finalize an Enhanced Regulatory Database accessible to all R&D department employees which will contain, in addition to other material, environmental compliance requirements arising from United States or

California laws, regulations, or guidance.

c.  Systematic Derivation of Technical Specifications.  By December 31, 2020, Defendants shall develop and establish an enhanced process for systematically deriving technical specifications from United States or California regulatory requirements for technical or environmental compliance.  The systematic derivation of technical specifications is intended to take the regulatory requirements for vehicle emissions and certification compliance and turn them into parameters or limits for engine or aftertreatment performance, which are then applied to the design of software.  Following December 31, 2020, derivation of these technical specifications will be a mandatory step in the development of powertrains for use in vehicles to be certified as light- and medium duty vehicles.

d.  Software Compliance Guide.  Defendants shall maintain and update their Software Compliance Guide and provide electronic access to the Guide to all R&D department employees.  Defendants' Software Compliance Guide shall require, at a minimum, that all software not detect or respond in any way to United States or California test cycles or test cycle parameters and that all software be designed independent from any such regulatory test cycles and test cycle parameters.

e.  Disclosure-Relevant Control Parameters.  By June 30, 2020, Defendants shall implement a process to identify, track, and list all disclosure-relevant control parameters to ensure that any changes that materially affect such control parameters are reflected in AECD disclosure documents as

required by United States or California laws, regulations, or guidance. After June 30, 2020 Defendants shall continually revise and update this list of disclosure-relevant control parameters.

f.     Compliance Check by Functional Group Leaders. Defendants are establishing and implementing the role of Functional Group Leaders and a tool-based requirement that Functional Group Leaders approve any new software functions developed or requested by Daimler to be used in ECUs, TCUs, CPCs, and DCUs in light-or medium-duty vehicles intended for certification in the United States or California.

i.     Defendants have established the role of Functional Group Leaders and have established a tool-based requirement that Functional Group Leaders approve any new software functions developed or requested by Daimler to be used in ECUs, TCUs, or CPCs in Mercedes-Benz Passenger Car vehicles to be certified as light- or medium duty that have been assigned to respective Functional Groups.

ii.    By July 1, 2020, Defendants shall implement the role of Functional Group Leader and implement this tool-based requirement that Functional Group Leaders approve any new software functions developed or requested by Daimler to be used in ECUs, TCUs, and CPCs in Mercedes-Benz Passenger Car vehicles that have been assigned to respective functional groups.

iii.      By July 1, 2020, Defendants shall establish the role of Functional Group Leader and establish a tool-based requirement that Functional Group Leaders approve any new software functions developed or requested by Daimler to be used in ECUs, TCUs, and CPCs in Mercedes-Benz Van and AMG vehicles, that have been assigned to respective functional groups.

iv.      By December 1, 2021, Defendants shall implement this tool-based requirement that Functional Group Leaders approve any new software functions developed or requested by Daimler to be used in ECUs, TCUs, CPCs, and DCUs in light-or medium-duty vehicles, that have been assigned to respective functional groups.

g.      <u>Software Screening</u>.

i.      <u>Screening of Functions for Review</u>.  By December 31, 2020, Defendants shall develop and establish a Tool-Supported Screening Process designed to identify functions that may qualify as AECDs during software development so that the functions will be further evaluated.

ii.      By March 31, 2021, and continuing thereafter, Defendants shall use a Tool-Supported Screening Process to screen all new U.S. powertrain projects to identify software functions that may qualify as AECDs.

iii.      <u>Tool-Supported Calibration Check</u>.  By December 31, 2019, Defendants shall use their Tool-Supported Calibration Check to

screen calibrations in ECU and TCU software of all gasoline and diesel vehicles intended for certification as light- and medium-duty vehicle models in the United States and shall use their Tool-Supported Calibration Check to screen ECU- and TCU- relevant software changes (running changes or changes implemented via field measures) developed or requested by Daimler to light- and medium-duty diesel vehicle models issued Certificates of Conformity or Executive Orders.

iv.    Beginning with MY2021, Defendants shall use their Tool-Supported Calibration Check to screen calibrations in DCU and CPC software of all vehicles intended for certification as light- and medium-duty diesel vehicle models in the United States and use their Tool-Supported Calibration Check to screen calibrations in CPC software of two light- or medium-duty gasoline vehicle models intended for certification in the United States.

v.    Beginning with MY2022 Defendants shall use their Tool-Supported Calibration Check to screen calibrations in CPC software of all vehicles intended for certification as light- and medium-duty gasoline vehicle models in the United States.

vi.    Beginning with MY2022, Defendants shall use their Tool-Supported Calibration Check to screen DCU- and CPC-relevant software changes (running changes or changes implemented via

field measures) to vehicles issued Certificates of Conformity or Executive Orders as light-duty and medium-duty diesel vehicles.

h.    <u>Controls on the Certification Process.</u>

    i.    <u>Off-Cycle Testing Prior to Certification.</u>

       A.    <u>Diesel</u>. Defendants shall continue to conduct PEMS and off-cycle dynamometer testing as specified in Appendix A to the MY2017 OM642 Sprinter AECD documentation for any new vehicles issued Certificates of Conformity or Executive Orders through and including MY2023 as light- or medium-duty diesel models.

       B.    <u>Gasoline</u>. Defendants shall conduct PEMS testing to demonstrate off-cycle tailpipe emissions and screen for undisclosed AECDs or defeat devices on three vehicles certified as light- or medium-duty gasoline Test Groups per Model Year from MY2021 through and including MY2024. Defendants shall select the Test Groups based on sales volume, selecting the highest volume Test Groups per Model Year using the projected 50 states' sales volumes prepared for NMOG + NOx fleet averages under Tier 3, except that Defendants shall not repeat testing of any Test Group during the duration of the Consent Decree. Defendants shall conduct the PEMS testing over the Combined Freeway and Uphill/Downhill Route and the

Urban/Downtown Los Angeles Route, specified in Appendix B, Attachment D, as follows: (1) multiple PEMS tests on the test vehicle may be conducted in the same Day; (2) the first PEMS test on each Day shall be started after a soak of at least 6 hours. The test vehicle may be parked outdoors in Los Angeles for the soak period, or indoors at an ambient temperature of between 68°F and 86°F; (3) if it is not possible to park the vehicle at the start of the PEMS route for the soak period, the vehicle may be cold-started at another location, provided that the emissions results and PEMS testing data are collected from engine-on and a map of the route is provided along with the other data reported under this Paragraph 30.h.i.B. Defendants have completed the required PEMS testing and submitted corresponding reports for MY2021. For each PEMS test conducted for MY2022 through and including MY2024, Defendants shall collect and report the following to EPA and CARB: (1) all raw data generated for speed, load, second-by-second emissions data, and the signals and parameters listed in Appendix E in a .CSV file format and in the native format of the PEMS unit, the AVL iFile; (2) average emissions results for NOx and CO2, ambient temperature and other information related to environmental conditions during the

test; (3) average emissions results for THC and CO, ambient temperature and other information related to environmental conditions during the test; and (4) a Flat File of each test that includes vehicle identification information, the VIN, a test identification number, and average emissions results per route segment (parsing). Post-processing of PEMS data shall be carried out as follows: (1) drift correction shall be performed in accordance with 40 C.F.R. § 1065.672; (2) wet/dry correction shall be performed in accordance with 40 C.F.R. § 1065.655; and (3) humidity correction shall be performed in accordance with 40 C.F.R. § 1065.670. Defendants shall also collect data for the signals and parameters listed at Appendix E. Defendants shall submit the PEMS testing emissions data to the certification departments at EPA and CARB, in the format specified by those certification departments, no later than, for EPA, three months prior to the submission of the Request for Certificate for the Test Group application for certification, and, for CARB, no later than 30 days after submission of the request for an Executive Order.

C.     <u>Public posting of data</u>. Within 30 Days of introduction to commerce of the first vehicle in each Test Group covered by Paragraphs 30.h.i.A and 30.h.i.B (*i.e.*, after approval of

certification of the Test Group), or within 30 Days of the Effective Date, whichever comes later, Defendants shall post the PEMS data described in Paragraphs 30.h.i.A and 30.h.i.B (redacted of any CBI or PII, the disclosure of which is restricted by applicable law, provided that no emissions test methods, data, or results may be claimed as CBI) on the public website required by Paragraph 16 of Appendix A, except that Defendants shall not be required to post the raw data generated for speed, load, second-by-second emissions data, and the signals and parameters listed in Appendix E.

D.    Testing entity. A team located in Los Angeles, California, and independent from Defendants' product development, shall conduct the testing required by this Paragraph.

E.    The Parties agree and acknowledge that neither United States nor California law sets forth a standard by which PEMS and off-cycle dynamometer testing can be used to determine compliance for purposes of certification under Title II of the Clean Air Act.

ii.    Emission-Related Parts List. As required by Appendix D, Section V, Paragraph C.2, Defendants shall maintain a list of Emission-Related parts in vehicles certified as light- and medium-duty vehicles, and update the list annually by December 31 to ensure

that the parts list complies with applicable regulatory guidelines while incorporating technological developments.

iii.    <u>AECD Documentation, Approval, and Review</u>. Beginning with MY2021, Defendants' shall require their Certification department to conduct checks of ECU datasets as an independent check that calibration values in the dataset match the values disclosed in AECD disclosure documentation to be submitted to EPA and CARB for vehicles intended to be certified as light- and medium-duty gasoline and diesel vehicles in the United States.

i.    <u>Lifecycle Management Control</u>.

    i.    <u>Tracking and Recording of Certified Configuration</u>. Beginning with MY2021, Defendants shall require their Certification department to retain certified software configurations for vehicles issued Certificates of Conformity as light-duty and medium-duty vehicles in the United States or Executive Orders in California in a centralized database.

    ii.    <u>Software Change Process</u>. Defendants shall require that all software changes to ECUs, TCUs, DCUs, or CPCs in light- and medium-duty vehicles issued Certificates of Conformity or Executive Orders be submitted to, and approved, or not approved by their Certification department.

    iii.    By December 31, 2019, and continuing thereafter, Defendants shall have their Certification department conduct a dataset check of

all proposed software changes to emissions-relevant functions in light-duty vehicle ECUs, TCUs (NAG3, 7-DCT, and 8-DCT), DCUs, or CPCs issued Certificates of Conformity or Executive Orders, in which that department will compare the software datasets before and after the proposed change to ensure that any proposed change is accurately described in the submissions to regulatory authorities.

iv.    By December 31, 2020, and continuing thereafter, Defendants shall have their Certification department conduct a dataset check of all proposed software changes to emissions-relevant functions in medium-duty vehicle ECUs, TCUs (NAG3, 7-DCT, and 8-DCT), DCUs, or CPCs issued Certificates of Conformity or Executive Orders, in which that department will compare the software datasets before and after the proposed change to ensure that any proposed change is accurately described in the submissions to regulatory authorities.

v.    Field Software Control.  By December 31, 2019, Defendants shall have their tCMS R&D department select and conduct sample checks of the software configurations of three vehicles certified as light- or medium-duty gasoline models in the field in the United States to determine whether such software configurations are consistent with each vehicle's certified configuration and confirm

61

that any changes to the certified configuration were made in accordance with regulatory requirements.

vi.     Beginning with MY2020, and continuing thereafter, Defendants shall require their tCMS R&D department to randomly select and conduct sample checks of vehicle software configurations of vehicles certified as light- or medium-duty in the field in the United States to determine whether such software configurations are consistent with each vehicle's certified configuration as reported to EPA and CARB, and to confirm that any changes to the certified configuration were made in accordance with United States and California regulatory requirements, as applicable.

31.     <u>Reporting of Corporate Compliance</u>.  Defendants shall report on their compliance with Paragraphs 20–30 on an annual basis consistent with the requirements of Section IX (Reporting).  Any violations of Paragraphs 20–30 shall be reported in the semi-annual reports consistent with the requirements of Section IX (Reporting).  Defendants shall report on any audits undertaken pursuant to Paragraphs 32 or 33 consistent with those requirements of this Consent Decree.  In reports submitted to EPA, and only in the copy of a report sent to EPA, Defendants shall exclude any material dealing with this Section VII (Corporate Compliance), with the exception of information required by Paragraphs 30.h.i and 30.h.ii, which shall be submitted to EPA.

32.     <u>Internal Audits</u>.

a.      Defendants shall maintain the organizational independence of their Corporate Audit by continuing to have the department report to the

Chairman of the BoM, the BoM member for IL, and, in addition to the Audit Committee of the Supervisory Board. This reporting is governed by Defendants' Corporate Audit Charter and must comprise both periodic and ad-hoc reporting, and ensure direct access to the ultimate governing and supervisory bodies of Defendants' present and any future corporate structure. Defendants will also maintain the organizational independence of their Corporate Audit by continuing to maintain a structure where Corporate Audit sets its budget with the ultimate oversight of the Audit Committee and in which Corporate Audit selects its own issues for audits, determines the scope of those audits, and adopts methods necessary for accomplishing its audit objectives.

b.  By September 1, 2020, Defendants shall designate an audit department with audit teams within Corporate Audit dedicated specifically to environmental compliance and tCMS, hereinafter the Post-Settlement Audit Team ("PSAT"). The PSAT shall have the expertise, responsibility, independence, and authority to assess environmental compliance with United States and California regulations and laws concerning vehicle emissions and certification. Defendants shall ensure that personnel on these audit teams have and retain the capability and qualifications to evaluate Defendants' tCMS and R&D processes, certification activities, and software development and, as necessary, have the ability to retain internal or external technical consultants to assist in an audit. Defendants shall ensure that all current and future PSAT members and all external

technical consultants are free from conflicts of interest regarding former employment, contract, or consulting work for suppliers listed as required by Paragraph 28.e.

c.    Defendants shall select the leader of the PSAT in consultation with the United States and California.   The PSAT leader shall have the expertise, responsibility, independence, and authority to direct and supervise the activities of the PSAT.

d.    The PSAT, through the PSAT leader, shall report directly to the Committee for Legal Affairs of the Daimler AG Supervisory Board (the "Committee for Legal Affairs") in addition to the BoM member for IL. The PSAT leader's reporting must comprise both periodic and ad-hoc reporting, and ensure direct access to the ultimate governing and supervisory bodies of Defendants' present and any future corporate structure.  Regardless of any future corporate structure, Defendants shall ensure that the PSAT continues to function as described herein, with all relevant authority and obligations.   The Committee for Legal Affairs shall have authority to direct and supervise the PSAT.  The removal or discipline of the PSAT leader or PSAT members shall be subject to the approval of the Committee for Legal Affairs.  No member of the BoM shall have the authority to direct or restrict the activities of the PSAT, or to remove or discipline the PSAT leader or PSAT members, without approval of the Committee for Legal Affairs.

e.    The PSAT shall operate under the terms of this Consent Decree until the

PSAT has submitted a fourth Audit Report pursuant to Paragraph 32.n.

f.      Beginning on the Effective Date the PSAT shall, on a risk basis, identify in annual Audit Plans aspects of the following to audit, and shall complete said audits:

    i.      the design, implementation status, and effectiveness of relevant tCMS processes, including certification processes, software development, compliance with United States and California environmental regulations and certification limits concerning vehicle emissions and certification;

    ii.      compliance with the terms of this Consent Decree, and

    iii.      the capabilities of individuals or organizational units to carry out tasks assigned to them regarding tCMS processes or compliance with the terms of this Consent Decree.

g.      The first annual audit shall include a review of the process used by Defendants to develop proposed Emission Modification Configurations and draft Emission Modification Proposal Reports pursuant to Appendix B of this Consent Decree. The audit shall specifically include a review of the coordination between the Mercedes-Benz Passenger Cars and Mercedes-Benz Van organizational units and any other organizational unit with responsibilities under Appendix B to ensure development of full and complete Emission Modification Proposal Reports, and it shall evaluate the accuracy of Emission Modification Proposal Reports already submitted to the United States, EPA, and CARB.

h.   As described in Paragraph 33.e, Audit Plans shall be submitted to the Committee for Legal Affairs.  No member of the BoM shall have the authority to direct or control the content of Audit Plans.

i.   The PSAT shall conduct audits based on:

    i.   the review of relevant documents and procedures, including anonymous feedback submitted through the BPO, and awareness of United States and California laws and regulations concerning vehicle emissions and certification;

    ii.   on-site observation of selected systems and procedures, including internal controls and record-keeping procedures;

    iii.   meetings with and interviews of relevant employees;

    iv.   analyses, studies, and testing of Defendants' environmental compliance under United States and California laws and regulations concerning vehicle emissions and certification and tCMS, including the review of software;

    v.   all standards and guidance for internal auditing as applicable provided by the Institute for Internal Auditors; and

    vi.   any reporting conducted by Defendants to the United States or California pursuant to the terms of this Consent Decree.

j.   The PSAT, as a part of Corporate Audit, shall have unrestricted access to all relevant corporate information, including but not limited to records, property, IT systems including software, and personnel.

k.   The PSAT shall complete the first audit (*i.e.*, completion of the final audit

in a series of audits) within one year of the Effective Date, and shall complete each subsequent audit (*i.e.*, completion of the final audit in a series of audits) on a recurring annual basis from the date of the first Audit Report under Paragraph 32.n.

l.   After the completion of the annual audit year (*i.e.*, after completion of the final audit in a series of audits within an audit year), the PSAT shall produce an Audit Report which contains:

    i.   a description of the audit or audits, including a description of the purpose of each audit;

    ii.   who conducted each audit, including the competencies of the members of the PSAT;

    iii.   how each audit was conducted including the information obtained and reviewed, and, if applicable, a description of any information that was unavailable;

    iv.   the results, conclusions and recommendations of any such audits;

    v.   to whom within Defendants' organization the results of such audits were provided;

    vi.   if applicable, whether previous audit recommendations were adopted and corrective measures timely taken and whether any previous audit concerns remain;

    vii.   any recommended changes or enhancements to the audits; and

        viii.        a declaration signed by two signatories, including the PSAT leader, that the audit was conducted in accordance with this Consent Decree.

m.     As described in Paragraph 33.f, within 30 Days after the completion of the final audit in a series of audits within each audit year, the PSAT shall produce a draft annual Audit Report to the Committee for Legal Affairs. No member of the BoM shall have the authority to direct or control the content of Audit Reports or drafts thereof.

n.     Within 60 days after the completion of each annual audit year the PSAT shall submit to the United States and California a final annual Audit Report, pursuant to Section XVI (Notices).

o.     The Committee for Legal Affairs shall submit, along with each annual Audit Report, a declaration, signed by each member of the Committee for Legal Affairs, regarding the efficacy of the PSAT's activities and Defendants' compliance with the Consent Decree, based on the annual audit(s).

p.     Within 60 days after receiving a final annual Audit Report containing a finding of noncompliance, Defendants shall submit a response to the PSAT that contains recommendations and a schedule for corrective action. Such schedule shall include an action plan to implement corrective measures as expeditiously as practicable, or an explanation of why corrective measures are not being implemented or, in the case of previous recommendations, corrective measures were not timely implemented.

Defendants shall implement any such corrective measures. After Defendants have completed implementation of the corrective measures, if any, Defendants shall provide, pursuant to Section XVI (Notices), a report to the United States and California with a certification that the work has been completed and that the work was conducted in accordance with the terms of this Consent Decree, as applicable, and consistent with the Audit Report and Defendants' response.

q. The PSAT shall coordinate and communicate on a regular basis with the Committee for Legal Affairs.

r. The PSAT shall consider any comments received from the United States or CARB in developing annual Audit Plans.

33. <u>External Compliance Consultant</u>.

a. Within 180 Days after the Effective Date, the Committee for Legal Affairs shall select and retain an individual to serve as the External Compliance Consultant ("ECC") to the Committee for Legal Affairs. The ECC shall advise and assist the Committee for Legal Affairs as the Committee for Legal Affairs fulfills its obligations under Paragraph 32. Within Defendants' organization, the ECC shall report solely to the Committee for Legal Affairs.

b. <u>Selection and Retention</u>. Defendants shall:

i. Request that ECC candidates submit a resume, biographical information, and any relevant material concerning each of the candidate's competence and qualifications to serve as the ECC;

ii.      Request that ECC candidates describe any past, present, or future business or financial relationship that the candidate has with Defendants, Defendants' suppliers or contractors, EPA, or CARB. The ECC shall not be an employee or an agent of Defendants, Defendants' subsidiaries, the United States or California, nor will he or she be currently engaged in any work for, or in representation of, Defendants;

iii.     Verify that, to Defendants' best knowledge and based on the reasonably available information, either the ECC candidate has no conflicts of interest with regard to this matter or any actual or apparent conflict has been waived by Defendants;

iv.     Verify that the ECC candidate has agreed not to be employed by Defendants, or Defendants' subsidiaries, for a minimum of two years after conclusion of work as the ECC; and

v.     Retain the ECC until the PSAT has submitted its final annual Audit Report.

c.     <u>Compensation.</u> Defendants shall be responsible for compensating the ECC in accordance with the terms agreed upon by the Committee for Legal Affairs of the Supervisory Board and the selected ECC and at a level of compensation and resources sufficient for the ECC to perform the duties outlined herein. Such terms of agreement shall state that the ECC is retained by the Daimler AG Supervisory Board, but is not an employee of Defendants.

d.      <u>Role, Duties, and Access Rights</u>.  The ECC shall be retained to advise and assist the Committee for Legal Affairs acting in its role supervising the PSAT's activities pursuant to Paragraph 32.  The ECC shall provide objective and fair assessments of the PSAT's activities under Paragraph 32 and Defendants' compliance with the terms of this Consent Decree to the Committee for Legal Affairs.  The ECC shall promptly report to the Committee for Legal Affairs any violations of this Consent Decree.  The PSAT shall fully cooperate with the ECC in exchanging relevant information in a timely manner.

e.      Prior to conducting an audit under Paragraph 32, the PSAT shall submit each annual Audit Plan to the Committee for Legal Affairs.  The ECC shall review each Audit Plan and provide recommendations to the Committee for Legal Affairs within 30 Days. The Committee for Legal Affairs shall have the discretion whether to adopt such recommendations and whether to require modifications to the annual Audit Plan.  Upon request, Defendants shall provide the United States a copy of any formal ECC recommendations, and a report on whether the Committee for Legal Affairs required modifications to the annual Audit Plan.  Defendants shall provide CARB a copy on any ECC recommendations within 30 days of the receipt by the Committee for Legal Affairs, and a subsequent report on whether the Committee required modifications to the annual Audit Plan.

f.      The PSAT shall produce draft Audit Reports to the Committee for Legal Affairs within 30 Days of completion of the final audit in a series of audits

within an audit year. The ECC shall review such draft Audit Reports and provide to the Committee for Legal Affairs any recommendations for modification regarding the content of the Audit Report or subsequent activities undertaken by the PSAT pursuant to Paragraph 32. The Committee for Legal Affairs shall have the discretion whether to adopt such recommendations and whether to require modifications or amendments to the Audit Report. The PSAT shall produce final Audit Reports to the Committee for Legal Affairs when it submits such Reports to the United States and California pursuant to Paragraph 32.n. Upon request, Defendants shall provide the United States or California any formal ECC recommendations on draft Audit Reports and a report on whether the Committee for Legal Affairs required modifications or amendments to an Audit Report.

g.    The Committee for Legal Affairs shall require full transparency from the PSAT with regard to its activities and findings under Paragraph 32. Additionally, the Committee for Legal Affairs may, at its discretion, empower the ECC to review this information. In such circumstances, the ECC shall report any observations or recommendations to the Committee for Legal Affairs. The Committee for Legal Affairs shall have the discretion whether to adopt such recommendations. Upon request, Defendants shall provide the United States or California any formal ECC recommendations on PSAT activities and a report on whether the Committee for Legal Affairs adopted any ECC recommendations.

34.     The Committee for Legal Affairs may otherwise request the assistance of the ECC in the course of carrying out its supervisory duties under Paragraph 32.

VIII.   MITIGATION

35.     <u>U.S. Mitigation Program</u>. As set forth in this Section, Defendants shall mitigate NOx emissions from Subject Vehicles (other than NOx emissions from Subject Vehicles in California), by implementing a program to reduce emissions from older locomotives (the "U.S. Mitigation Program").

      a.     Pursuant to the U.S. Mitigation Program, by no later than 40 months from the Effective Date, Defendants shall fund, in whole, the repowering of 15 unregulated, Tier 0, Tier 0+, Tier 1, or Tier 1+ line-haul locomotives as defined in 40 C.F.R. § 1033.901. "Repowering" refers to replacing the existing engines with engines certified to EPA Tier 4 or more stringent locomotive emission standards. Defendants may satisfy this obligation by funding the repowering aspect of a locomotive rebuild. "Rebuild" refers to the complete down-to-frame rebuild of the entire locomotive.

      b.     These projects shall be referred to as "Environmental Mitigation Projects." Defendants shall provide evidence of the progress and completion of Environmental Mitigation Projects and other information as set forth in Paragraph 42.c.i. Defendants' implementation of the U.S. Mitigation Program will be deemed to fully mitigate the total lifetime excess $NO_x$ emissions from Subject Vehicles in the United States, excluding California, as claimed by the United States.

      c.     <u>Selection Criteria</u>. Defendants or their implementing Third Party or Third

Parties shall use the following selection criteria when implementing the U.S. Mitigation Program.

i.      In selecting line-haul locomotives, Defendant shall use reasonable best efforts to preferentially repower/rebuild locomotives that are likely to run long distances to geographically diverse locations across the continental United States, except that Defendants shall not be required to repower/rebuild locomotives located in or traveling to California.

ii.      In selecting suppliers or manufacturers of Tier 4 engines, or when selecting recipients of the engines: (1) Defendants shall not preferentially select manufacturers that are Daimler-AG controlled entities over other manufacturers or suppliers; and (2) Defendants shall use reasonable best efforts to not preferentially select public or governmental entities over private entities.

36.     Defendants, in their sole discretion, may satisfy the obligations in Paragraph 35 by funding Environmental Mitigation Projects that are to be implemented by one or more state, local, tribal, independent non-profit organizations, or other third party entities (each a "Third Party"). If Defendants use a state, local, tribal, or independent non-profit organization to implement an Environmental Mitigation Project, Defendants shall require the state, local, tribal, or independent non-profit organization to identify, in writing: (1) its legal authority for accepting such funding; and (2) its legal authority to conduct the Environmental Mitigation Project for which Defendants contribute the funds. The use of a Third Party to carry out the requirements herein shall in no way alter the Defendants' obligations under the Consent Decree. In selecting a

Third Party or Third Parties, Defendants shall consider whether a bidding or application program would ensure a fair process and would be practical. If Defendants undertake such a bidding or application program, the deadlines for implementation of the U.S. Mitigation Program contained in Paragraph 35 shall be amended so that Defendants must implement the U.S. Mitigation Program by repowering/rebuilding 15 locomotives by no later than 45 months from the Effective Date.

37.     Defendants shall require, or shall instruct any Third Parties to require, that any recipients receiving funds or equipment under the U.S. Mitigation Program shall provide to Defendants or to the Third Party a written certification that the recipient will, within a reasonable time, permanently destroy or salvage for parts the replaced locomotive engines upon acceptance of such funds or equipment. For avoidance of doubt, the crankshaft and block shall be destroyed.

38.     In the event that Defendants determine that it is impractical to complete the U.S. Mitigation Program identified in Paragraph 35, Defendants shall notify the United States in accordance with Section XVI. Within 21 Days of providing notice, Defendants shall submit to the United States a supplemental mitigation plan ("Supplemental Mitigation Plan") for review and approval in accordance with Section V (Approval of Submissions; U.S./CARB Decision-Making). The Supplemental Mitigation Plan shall provide:

> a.     A description of the proposed Supplemental Mitigation Project(s);
>
> b.     A plan for implementing the Supplemental Mitigation Project(s);
>
> c.     A proposed number of Supplemental Environmental Project(s) to conduct; and

       d.     The proposed schedule for implementation of the Supplemental Mitigation Plan.

39.     The United States shall respond to Defendants' proposed Supplemental Mitigation Plan pursuant to Paragraph 13 within 30 Days. If the United States fails to make a determination within 30 Days of receipt of the proposal, Defendants may, at their discretion, consider the plan to be denied for the purpose of invoking Dispute Resolution pursuant to Section XII (Dispute Resolution) of this Consent Decree. The Parties shall otherwise adhere to the requirements set forth in Section V (Approval of Submissions; U.S./CARB Decision-Making). Upon approval, conditional approval, or partial approval by the United States, Defendants shall implement the Supplemental Mitigation Plan according to the schedule for implementation contained therein. Such a schedule for implementation shall supersede the schedule for implementation contained in Paragraphs 35 and 36.

40.     Defendants shall continue to implement the U.S. Mitigation Program and submit semi-annual reports under Paragraph 42.c.i until evidence is provided that 15 line-haul locomotives have been repowered in accordance with Paragraph 35.a.

41.     <u>California Mitigation Program</u>. Defendants have entered into a separate agreement with California, which is intended to fully mitigate the total lifetime excess $NO_x$ emissions from the Subject Vehicles in California as claimed by California. That agreement is set forth in a separate proposed consent decree between Defendants and California (the "California Partial Consent Decree") that has been lodged contemporaneously with this Consent Decree.

## IX.    REPORTING REQUIREMENTS

42.    <u>Consent Decree Compliance Reports</u>.  Defendants shall submit separate semi-annual Consent Decree compliance reports to the United States, EPA, and CARB that include the content specified in the subparagraphs below.  An agency shall not receive the content of a subparagraph unless the agency is specifically identified in the subparagraph or the agency otherwise requests the content.

a.    <u>Emission Modification Program</u>.

i.    To CARB only: Each Eligible Vehicle, listed by Emission Modification Category, VIN, Model, Model Year, and Test Group that has received an Approved Emission Modification in California and the date of such modification pursuant to Appendix A, Paragraph 3 (Modification of Eligible Vehicles with Approved Emission Modification) since the last semi-annual report submitted by Defendants, which information shall be reported in an Excel data spreadsheet;

ii.    To CARB only: Defendants' progress toward reaching the California Passenger Vehicle EMP Rate and California Sprinter EMP Rate since the last semi-annual report submitted by Defendants;

iii.    To CARB only: Each Subject Vehicle registered in California at the time of the report, listed by Emission Modification Category, VIN, Model, Model Year, and Test Group that, based on current information available to Defendants, has been resold or, exported,

and the date of such resale or export, pursuant to Appendix A, Paragraph 6 (Resale and Export of Subject Vehicles) since the last semi-annual report submitted by Defendants, or which has been rendered permanently inoperable or destroyed, and the date of such rendering or destruction since the last semi-annual report submitted by Defendants, which information shall be reported in an Excel data spreadsheet;

iv.     To CARB only: Any Eligible Vehicle by Emission Modification Category, VIN, Model, Model Year, and Test Group for which the Approved Emission Modification was sought by an Eligible Owner or Eligible Lessee in California, but not applied, and the date on which the modification was sought, pursuant to Appendix A, Paragraph 8 (Grounds for Refusal to Apply the Modification to an Eligible Vehicle), and the grounds for Defendants' decision not to install the Approved Emission Modification since the last semi-annual report submitted by Defendants, which information shall be reported in an Excel data spreadsheet;

v.      To CARB only: A compilation of all notices and information distributed to Eligible Owners or Eligible Lessees in California pursuant to Appendix A, Paragraph 15 (Consumer Emission Modification Disclosure) since the last semi-annual report submitted by Defendants, including any updates to the public

website specified in Appendix A, Paragraph 16 (Online Access to Information);

vi.    To CARB only: A compilation of all notices and information distributed to Dealers in California pursuant to Appendix A, Paragraph 17 (Dealer Disclosures) since the last semi-annual report submitted by Defendants;

vii.    To the United States, EPA, and CARB: Additionally, Defendants shall provide the United States, EPA, and CARB with any information reasonably requested and in the possession of Defendants related to Defendants' compliance with the Emission Modification Program requirements within 30 Days of the request by the agency or agencies, or longer with the requesting Party's agreement. Defendants shall provide the information only to the requesting agency or agencies.

viii.    To the United States, EPA, and CARB: For each of the National Sprinter EMP Rate, the National Passenger Vehicle EMP Rate, the California Sprinter EMP Rate, and the California Passenger Vehicle EMP Rate, in the semi-annual Consent Decree compliance report following the earlier of the applicable date specified in Appendix A, Paragraph 4 or the date Defendants meet the respective EMP Rate, Defendants shall provide an assessment as to whether Defendants have met the respective EMP Rate, and they shall provide a list in an Excel data spreadsheet, by VIN and

separated by vehicles located within California and outside of California, of: (1) every Subject Vehicle that Defendants assert has received an AEM under the terms of this Consent Decree; (2) every Subject Vehicle that Defendants assert has been permanently removed from commerce; and (3) every Subject Vehicle that Defendants assert has been purchased by Defendants by the date specified in Appendix A, Paragraph 4.

b.    <u>In-Use Testing</u>.

    i.    To EPA and CARB: A summary of all activities since the last semi-annual report submitted by Defendants, if any, relating to in-use testing under Paragraph 19, including the selection and screening of Subject Vehicles, in-use verification testing of IUVT Vehicles, and in-use confirmatory testing of IUCP Vehicles.

    ii.    To EPA and CARB: Any data required by Paragraph 19.a and Paragraph 19.b.i.A.

c.    <u>Mitigation</u>.

    i.    Defendants shall submit to the United States semi-annual reports that identify the number of Environmental Mitigation Projects in progress and completed by the date of the submission of each semi-annual report.

    ii.    The parties agree that until termination of the Consent Decree in accordance with Section XX, any information submitted under Section VIII that provides the identity or any identifying

information of any Third Party or locomotive owner, as well as any information reported pursuant to Paragraph 42.c.i, shall be treated as CBI, provided that Defendants follow the procedures set forth in Paragraph 84 and 40 C.F.R. Part 2. Further, Defendants shall take reasonable measures to protect the confidentiality of such information.

iii. <u>Additional Certification</u>. In the first semi-annual report required by Paragraph 42.c.i, Defendants shall certify in accordance with Paragraph 48 that:

A. They are not required to perform the U.S. Mitigation Program by any federal, state, or local law or regulation or by any agreement, grant, or as injunctive relief awarded in any other action in any forum;

B. Defendants are unaware of any other person who is required by law to, or, as of the Date of Lodging, otherwise planned or intended to, construct, perform, or implement the U.S. Mitigation Program.

C. The U.S. Mitigation Program is not a project that Defendants were planning or intending to construct, perform, or implement other than in settlement of the claims resolved in the Consent Decree;

D.      Defendants have not received and will not receive credit for the U.S. Mitigation Program in any other enforcement action; and

E.      Defendants will not receive any reimbursement for any of the costs they expend implementing the U.S. Mitigation Program from any person, except to the extent that Defendants reimburse each other for the costs of implementing the U.S. Mitigation Program.

d.      <u>Data</u>. All data shall be reported using the number of significant figures in which the pertinent standard, limit, or requirement is expressed.

43.      <u>Timing of Reports</u>. Unless otherwise specified in this Consent Decree, or the Parties otherwise agree in writing:

a.      To the extent semi-annual or annual reporting is required under this Consent Decree, Defendants shall submit each report one month after the end of the applicable prior six-month period (*i.e.*, by January 31 or July 31) or annual calendar period (*i.e.*, by January 31), that shall cover the prior six-month period or prior annual calendar period, respectively, and the items specified elsewhere in this Consent Decree.

b.      The first report shall be due by the last Day of the month following the end of the first six-month period, or annual calendar period, as applicable, after this Consent Decree is entered. However, if this Consent Decree is entered fewer than 45 Days before the end of the first six-month period, the first report shall not be due until the last Day of the month following

the end of the second six-month period after entry.  Reporting shall
continue until this Consent Decree is terminated in accordance with
Section XX (Termination).

44.    <u>Reporting of Violations</u>.

a.    <u>Reporting of Violations</u>.  If Defendants violate, or reasonably believe they
may violate, a requirement of this Consent Decree for which a stipulated
penalty applies under Paragraph 53, and Defendants have not remedied or
will not remedy the violation within ten Business Days of the Day
Defendants reasonably learn that the violation occurred or may occur,
Defendants shall notify the United States and CARB of such violation and
its likely duration, in writing, within ten Business Days of the Day
Defendants first reasonably learn that the violation occurred or may occur,
with an explanation of the violation's likely cause.  Within an additional
four Business Days, Defendants shall notify the United States and CARB
in writing of the remedial steps taken, or to be taken, to prevent or
minimize such violation, and the dates on which such remedial steps are to
be, or have been taken.  If Defendants believe the cause of a violation
cannot be fully explained at the time the report is due, Defendants shall so
state in the report.  Defendants shall investigate the cause of the violation
and shall then submit an amendment to the report, including a full
explanation of the cause of the violation, within 30 Days of the Day
Defendants reasonably believe they have determined the cause of the
violation.   Nothing in this Paragraph or the following Paragraph relieves

Defendants of their obligation to provide the notice required by Section XI (Force Majeure).

b.  <u>Semi-Annual Report of Violations</u>.  On January 31 and July 31 of each year, Defendants shall submit a summary to the United States and CARB of any violations of this Consent Decree that occurred during the preceding six months (or potentially shorter period for the first semi-annual report).  The summary shall include: (1) the date of the violation; (2) a brief description of the violation; (3) a brief description of steps taken to remedy the violation; and (4) for violations Defendants are required to report under Paragraph 44.a, a list of violations previously reported and the date the notice of violation was sent. If no violations occurred during the reporting period, Defendants shall submit a statement that no violations occurred.

45.  Whenever Defendants reasonably believe any violation of this Consent Decree or any other event affecting Defendants' performance under this Consent Decree may pose an immediate threat to the public health or welfare or the environment, Defendants shall notify EPA and CARB by telephone and email as soon as possible, but no later than 24 hours after Defendants first reasonably believe the violation or event may pose an immediate threat to the public health or welfare or the environment. This procedure is in addition to the notice requirements set forth in Paragraph 44.

46.  Unless specified elsewhere in this Consent Decree, all reports shall be submitted to the persons designated in Section XVI (Notices).

47. All information required to be posted to a public web page by this Consent Decree shall be accessible on the public web page that Defendants use to administer the Emission Modification Program pursuant to Appendix A, Paragraph 16, and a link to such web page shall be accessible from Defendants' primary consumer website in the United States. This web page link shall be provided to EPA and CARB with Defendants' signature pages to this Consent Decree, and Defendants shall send any new web page link to EPA and CARB within ten Business Days if the web page is moved.

48. Each report submitted by Defendants under this Section shall be signed by an officer or Director of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, correct, and complete. I have no personal knowledge that the information submitted is other than true, correct, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

49. Defendants agree that the certification required by Paragraph 48 is subject to 18 U.S.C. §§ 1001(a) and 1621, and California Penal Code §§ 115, 118, and 132.

50. The certification requirement in Paragraph 48 does not apply to emergency or similar notifications where compliance would be impractical.

51. The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

52.     Any information provided pursuant to this Consent Decree may be used by the United States or California in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## X.     STIPULATED PENALTIES

53.     Defendants shall be liable for stipulated penalties to the United States and California for violations of this Consent Decree as specified in this Section, unless excused under Section XI (Force Majeure). There shall be only one stipulated penalty assessed per violation against the Defendants, for which they shall be jointly and severally liable. A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

a.     Late Payment of Civil Penalty. If Defendants fail to pay the civil penalty required under Section IV (Civil Penalty) of this Consent Decree when due, Defendants shall pay stipulated penalties as follows for each Day the payment is late:

| Penalty per Day | Period of Noncompliance |
|---|---|
| Interest | 1st through 4th Day (per 28 U.S.C. § 1961) |
| $50,000 | 5th through 30th Day |
| $100,000 | 31st through 45th Day |
| $200,000 | 46th Day and beyond. |

b.     Injunctive Relief Requirements: Section VI, Paragraph 18 (Emission Modification Program), Appendices A and B, and their Attachments.

i.     Failure to Establish Emission Modification Program Call Center. If Defendants fail to establish and maintain an Emission

Modification Program call center as required by Appendix A, Paragraph 1, Defendants shall pay the following stipulated penalties for each Day that the call center is delayed:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 10th Day |
| $4,000 | 11th through 30th Day |
| $15,000 | 31st Day and beyond. |

ii.  Failure to Establish Emission Modification Program Website. If Defendants fail to establish and maintain a website for the Emission Modification Program as required by Appendix A, Paragraphs 1 and 16, Defendants shall pay the following stipulated penalties for each Day the website is not maintained:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $10,000 | 15th through 30th Day |
| $50,000 | 31st Day and beyond. |

iii.  Failure to Timely Initiate Offer of AEM. If Defendants fail to make an Approved Emission Modification available within 15 Business Days of the date specified in Appendix A, Paragraph 15.a, Defendants shall pay the following stipulated penalties for each Day the offer is delayed:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $10,000 | 1st through 14th Day |
| $20,000 | 15th through 30th Day |
| $35,000 | 31st Day and beyond. |

iv.  Early Termination of Emission Modification Program. If Defendants terminate an Emission Modification Program for any

87

Eligible Vehicle prior to the date specified in Appendix A, Paragraph 7 (15 years after the Model Year of the Subject Vehicle or 8 years after the approval of the applicable Approved Emission Modification), Defendants shall pay the following stipulated penalty for each Day on which the Emission Modification Program should have been offered but was not:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $4,000 | 1st through 30th Day |
| $10,000 | 31st through 60th Day |
| $20,000 | 61st Day and beyond. |

v.     <u>Failure to Provide Emission Modification Program Disclosures</u>. If Defendants fail to execute the disclosures as required by Appendix A, Paragraph 15 or Paragraph 17, Defendants shall pay the following stipulated penalties for each Day such disclosure is not provided:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

vi.     <u>Misleading Disclosures or Advertisements</u>. If Defendants provide any materially misleading or inaccurate disclosure to any Eligible Owner or Eligible Lessee regarding the individual owner or lessee's rights or available remedies under the Emission Modification Program, including, but not limited to, any rights or available remedies under the Warranty provisions set forth in

Appendix A, Paragraphs 18–20, Defendants shall have 30 Days to correct such disclosure after EPA or CARB advise Defendants that the disclosure is materially misleading or inaccurate. If Defendants fail to correct the disclosure within 30 Days after such notification, the following stipulated penalty shall apply per Day the disclosure is not corrected after the 30 Days:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $10,000 | 1st through 14th Day |
| $25,000 | 15th through 30th Day |
| $50,000 | 31st Day and beyond. |

vii.    <u>Failure to Comply with Labeling Requirements</u>. If Defendants fail to ensure that any Eligible Vehicle that receives the Approved Emission Modification is affixed with a label, as required by Appendix A, Paragraph 13, before such vehicle is sold, leased, offered for sale or lease, otherwise introduced into commerce, or returned to the Eligible Owner or Eligible Lessee, or if the information included in any such label is incorrect, Defendants shall pay a stipulated penalty of $1,000 per label, per vehicle, provided that no stipulated penalty shall accrue for the first 15 Days that the label is not affixed.

viii.    <u>No Release of Private Party Claims</u>. If Defendants require any release of liability for any legal claims that an Eligible Owner or Eligible Lessee may have against Defendants or any other person solely in exchange for receiving the Approved Emission

Modification, or if Defendants require any customer payment or release of any Eligible Owner's or Eligible Lessee's right in exchange for performing the Approved Emission Modification, in violation of Appendix A, Paragraphs 7 and 11, Defendants shall pay a stipulated penalty of $7,500 per affected vehicle.

ix.     Failure to Honor Warranties.

A.     If Defendants fail to honor or cause any Dealer to fail to honor the Extended Modification Warranty described in Appendix A, Paragraph 18, Defendants shall pay a stipulated penalty of $20,000 for each vehicle for which the Extended Modification Warranty was not properly honored. In addition, Defendants shall reimburse the affected Eligible Owner or Eligible Lessee any amount paid by the Eligible Owner or the Eligible Lessee to Defendants or to a Dealer because of the failure to honor the Extended Modification Warranty. Defendants' liability for stipulated penalties for failure to honor the Extended Modification Warranty shall not accrue unless and until there have been 100 instances of action or inaction that would give rise to a stipulated penalty. Once the threshold number of instances is reached, Defendants shall be liable for every instance of failure to honor the Extended Modification Warranty.

B.      Notwithstanding the requirements of Paragraph 53.b.ix.A
above, if the requirements of Paragraph 18.a and 18.b are
satisfied, Defendants shall not be liable for any stipulated
penalty for failure to honor the Extended Modification
Warranty described in Appendix A, Paragraph 18, unless
and until the Class Action Settlement claims review
committee considers and finally adjudicates a warranty
claim dispute and finds in favor of the Eligible Owner or
the Eligible Lessee in accordance with the process required
in the Class Action Settlement. In such a case, Defendants
shall pay a stipulated penalty of $20,000 for each warranty
claim dispute that the Class Action Settlement review
committee considers and finally adjudicates in favor of the
Eligible Owner or the Eligible Lessee in accordance with
the process required in the Class Action Settlement. In
addition, Defendants shall reimburse the Eligible Owner or
the Eligible Lessee any amount paid by the Eligible Owner
or the Eligible Lessee to Defendants or to a Dealer because
of the failure to honor the Extended Modification
Warranty. Defendants' liability for failure to honor the
Extended Modification Warranty shall not accrue until
there have been 100 instances in which the Class Action
Settlement claims review committee considers and finally

adjudicates a warranty claim dispute in favor of the Eligible Owner or the Eligible Lessee in accordance with the process required in the Class Action Settlement. Once the threshold number of instances is reached, Defendants shall be liable for every instance in which the Class Action Settlement review committee considers and finally adjudicates a warranty claim dispute in favor of the Eligible Owner or the Eligible Lessee in accordance with the process required in the Class Action Settlement.

x.      Penalties for Export, Sale, or Re-Sale of Unmodified Vehicles. If, after the Date of Lodging of this Consent Decree or after the date of approval of the applicable Emission Modification, whichever is later, Defendants sell, lease, introduce into commerce, or cause or arrange for any Dealer or other entity to do the foregoing, or fail to instruct its Dealers not to sell, lease, or introduce into commerce any Subject Vehicle that has not received an Approved Emission Modification in violation of the requirements of Appendix A, Paragraphs 5 or 6, Defendants shall pay $25,000 per affected Subject Vehicle. If, after the Date of Lodging of this Consent Decree, Defendants export, or fail to instruct Dealers not to export, from the United States to another country, any Subject Vehicle that has not received an Approved Emission Modification in violation of the requirements of Appendix A, Paragraph 6, except where that

Subject Vehicle is exported to Germany as permitted by Appendix A, Paragraph 6, Defendants shall pay $25,000 per affected Subject Vehicle.

xi.     Failure to Submit a Complete Emission Modification Proposal Report or OBD Interim Report. If Defendants fail to timely submit or resubmit a complete proposed Emission Modification Proposal Report as required under Appendix B, Paragraph 4, or fail to timely submit or resubmit a complete OBD Interim Report as required under Appendix B, Paragraph 3 (which shall include failure to submit any required content in either the Emission Modification Proposal Report or the OBD Interim Report, or to complete testing in accordance with Appendix B), the following stipulated penalties shall accrue for each Day the report remains incomplete:

| Penalty per Day | Period of Noncompliance |
| --- | --- |
| $2,000 | 1st through 14th Day |
| $10,000 | 15th through 30th Day |
| $50,000 | 31st Day and beyond. |

xii.    Failure to Submit an Emission Modification Proposal Report that Meets the Emission Standard, Emission Standard First Threshold, or Emission Standard Upper Threshold. If Defendants' proposed Emission Modification fails to meet the Emission Standard for the relevant Emission Modification Category, Defendants shall pay the following stipulated penalties per Eligible Vehicle as of the date

specified in Appendix A, Paragraph 4 in that Emission

Modification Category (but not per Day):

    (1)    below the Emission Standard First Threshold, but above the Emission Standard: $7,000

    (2)    below the Emission Standard Upper Threshold, but above the Emission Standard First Threshold: $16,000

    (3)    above the Emission Standard Upper Threshold: $25,000.

xiii.    <u>Failure to Provide EPA or CARB with Test Vehicles, Equipment, or Software</u>. If Defendants fail to provide a Test Vehicle, equipment, or software within 45 Days of a request by EPA/CARB, as provided in Appendix B, Paragraph 5.b, Defendants shall pay the following stipulated penalty per Test Vehicle for each Day the Test Vehicle is not provided:

| <u>Penalty per Day</u> | <u>Period of Noncompliance</u> |
| --- | --- |
| $5,000 | 1st through 14th Day |
| $20,000 | 15th through 30th Day |
| $50,000 | 31st Day and beyond. |

xiv.    <u>Failure to Comply with Prohibition on Defeat Devices</u>. If Defendants propose to modify, modify, or cause to be modified, a Subject Vehicle after the Effective Date by updating such vehicle with a configuration of software and calibrations that contains a Defeat Device, Defendants must pay a stipulated penalty to the United States and CARB of $20,000,000 per Defeat Device (but not per vehicle).

xv.   Failure to Disclose AECDs. If a proposed Emission Modification or Approved Emission Modification includes an AECD that Defendants have not listed and described in the Updated AECD Document for that Emission Modification Category as of the date of submission of the relevant Emission Modification Proposal Report, Defendants shall pay the following stipulated penalties:

(1)   $1,000,000 per undisclosed AECD that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use (but not per vehicle), and

(2)   $100,000 per undisclosed AECD that is wholly emissions neutral or that improves the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use (but not per vehicle).

xvi.   Failure to Comply with Post-Entry Provisions Related to Modification of the Subject Vehicles Updated with the AEM. If, after implementing the Approved Emission Modification, Defendants fail to follow the procedures in Appendix A, Paragraph 14 for modifying the Subject Vehicles, Defendants shall pay to the United States and CARB a stipulated penalty of:

(1)   $900,000 for each failure to submit a proposal in accordance with the requirements in Appendix A, Paragraph 14.a (but not per vehicle); and

(2)   $500,000 for each failure to submit a report to EPA and CARB in accordance with the requirements of Appendix A, Paragraph 14.b (but not per vehicle).

xvii. <u>Failure to Meet the Emission Modification Program Rate</u>. If Defendants fail to achieve an Emission Modification Program Rate by the dates required in Appendix A, Paragraph 4, Defendants shall pay a stipulated penalty of:

(1) $9,137,866.78 for each percentage point that the National Sprinter EMP Rate falls short of 85 percent;

(2) $6,445,600.34 for each percentage point that the National Passenger EMP Rate falls short of 85 percent;

(3) $1,485,665.16 for each percentage point that the California Sprinter EMP Rate falls short of 85 percent; and

(4) $1,325,908.64 for each percentage point that the California Passenger EMP Rate falls short of 85 percent.

In calculating any payment under this Paragraph 53.b.xvii, each Emission Modification Program Rate shall be rounded to the nearest percentage point, except that any number between 84 percent and 85 percent shall be considered a one percent shortfall for calculation of the relevant stipulated penalty.

c. <u>Injunctive Relief Requirements: Section VI, Paragraphs 18 and 18.a (OBD Requirements)</u>.

i. <u>Pre-Approved OBD Noncompliances</u>. Within 30 Days of the Effective Date, Defendants shall pay to CARB $35,436,600 for the Cluster 1 Pre-Approved OBD Noncompliances and $7,271,300 for the Cluster 5 Pre-Approved OBD Noncompliances. Within 30

Days of the Effective Date, Defendants shall pay to the United States $21,804,800 for the Cluster 1 Pre-Approved OBD Noncompliances and $5,796,000 for the Cluster 5 Pre-Approved OBD Noncompliances. Defendants shall also follow the additional extended warranty provisions of Appendix A, Paragraph 18.d.i.A and with respect to ten Cluster 1 Pre-Approved OBD Noncompliances, as determined by EPA/CARB, and with respect to seven Cluster 5 Pre-Approved OBD Noncompliances, as determined by EPA/CARB.

ii.    Additional OBD Noncompliances. Within 30 Days of EPA/CARB's approval of the Emission Modification Proposal Report of each EMC in an OBD Cluster, Defendants shall pay to CARB the stipulated penalty required under Paragraph 53.c.ii.A or 53.c.ii.B, as applicable, per OBD Noncompliance determined by EPA/CARB in the approval of the Report. In the event that Defendants report any OBD Noncompliance in an Emission Modification Proposal Report of an EMC that was not present in a previously submitted EMC Emission Modification Proposal Report within the same OBD Cluster, Defendants shall pay to CARB the amount provided for under Paragraph 53.c.ii.A or 53.c.ii.B, as applicable, for that newly-reported OBD Noncompliance, even if the number of OBD Noncompliances is the same for each EMC within a Cluster.

A.    <u>Class 1 Additional OBD Noncompliances</u>.  If EPA/CARB determine that one or more Subject Vehicles fail to comply with the OBD requirements in the applicable version of 13 C.C.R. § 1968.2, and if such failure is not a Pre-Approved OBD Noncompliance under Appendix B, Paragraph 2.f.i.A or a DOC OBD Noncompliance under Paragraph 12 or 13 of the California Partial Consent Decree, and Defendants disclose the failure to comply in the respective Emission Modification Proposal Report for each Emission Modification Category to which the failure to comply applies, such failure shall be known as a Class 1 Additional OBD Noncompliance, and Defendants shall pay to CARB a stipulated penalty per OBD Cluster, per OBD Noncompliance of:

    (1)    $339,900 per OBD Noncompliance for Cluster 2;

    (2)    $214,850 per OBD Noncompliance for Cluster 3; and

    (3)    $224,650 per OBD Noncompliance for Cluster 4.

For avoidance of doubt, this subparagraph also applies if Defendants report any failure to comply in the respective Emission Modification Proposal Report for the Emission Modification Category to which the failure applies that Defendants would also report under Paragraphs 19.a and 19.c.

B.      Class 2 Additional OBD Noncompliances.   If EPA/CARB determine that one or more Subject Vehicles fail to comply with the OBD requirements in the applicable version of 13 C.C.R. § 1968.2, and if such failure is not a Pre-Approved OBD Noncompliance under Appendix B, Paragraph 2.f.i.A or listed in Appendix B, Attachment L, a Class 1 Additional OBD Noncompliance, or a DOC OBD Noncompliance under Paragraph 12 or 13 of the California Partial Consent Decree, and Defendants disclose the failure to comply in the respective Emission Modification Proposal Report for each Emission Modification Category to which the failure applies, such failure shall be known as a Class 2 Additional OBD Noncompliance, and Defendants shall pay to CARB a stipulated penalty per OBD Cluster, per OBD Noncompliance of:

    (1)    $509,850 per OBD Noncompliance for Cluster 2;

    (2)    $322,275 per OBD Noncompliance for Cluster 3;

    (3)    $336,975 per OBD Noncompliance for Cluster 4; and

    (4)    $337,050 per OBD Noncompliance for Cluster 5.

For avoidance of doubt, this subparagraph also applies if Defendants report any failure to comply in the respective Emission Modification Proposal Report for the Emission Modification Category to which the failure applies that

99

Defendants would also report under Paragraph 19.a.

iii.      <u>Unreported OBD Noncompliances</u>.  If EPA and CARB determine that one or more Subject Vehicles fail to comply with the OBD requirements in the applicable version of 13 C.C.R. § 1968.2 and Defendants do not disclose such failure to comply in the Emission Modification Proposal Report for each Emission Modification Category, and if such failure is not a Pre-Approved OBD Noncompliance, Class 1 or Class 2 Additional OBD Noncompliance, or DOC OBD Noncompliance under Paragraph 12 or 13 of the California Partial Consent Decree, Defendants shall pay to the United States and CARB a stipulated penalty per OBD Cluster, per OBD Noncompliance of:

      (1)    $10,902,400 per OBD Noncompliance for Cluster 1;

      (2)    $3,881,400 per OBD Noncompliance for Cluster 2;

      (3)    $2,271,900 per OBD Noncompliance for Cluster 3;

      (4)    $2,072,000 per OBD Noncompliance for Cluster 4; and

      (5)    $1,932,000 per OBD Noncompliance for Cluster 5.

For avoidance of doubt, this subparagraph also applies in the event that Defendants report any failure to comply under Paragraph 19.a and the failure is not a Pre-Approved OBD Noncompliance, a Class 1 or Class 2 Additional OBD Noncompliance, or a DOC OBD Noncompliance under Paragraph 12 or 13 of the California Partial Consent Decree.

iv.    <u>Section 1968.5 OBD Noncompliances</u>.  If an Approved Emission Modification fails to comply with the applicable version of 13 C.C.R. § 1968.5(b)(6) (except 13 C.C.R. § 1968.5(b)(6)(C)(ii), (c)(3), (c)(4) (2016), and except for a DOC OBD Noncompliance under Paragraph 12 or 13 of the California Partial Consent Decree), Defendants shall pay to the United States and CARB a stipulated penalty of $1,000 per Subject Vehicle as of the date in Appendix A, Paragraph 4, per Section 1968.5 OBD Noncompliance, and may, within 30 Days of receiving EPA's and CARB's determination of 13 C.C.R. § 1968.5 Noncompliances, seek EPA's and CARB's approval for a modification related to the Approved Emission Modification under Appendix A, Paragraph 14 to remedy the failure to comply with the applicable version of 13 C.C.R. § 1968.5(b)(6).

v.    <u>Inspection and Maintenance Mandatory Recall</u>.  If an Approved Emission Modification contains an OBD Noncompliance referenced in the applicable version of 13 C.C.R. § 1968.5(b)(6)(C)(ii), except for a DOC OBD Noncompliance under Paragraph 12 or 13 of the California Partial Consent Decree, Defendants shall pay to the United States and CARB a stipulated penalty per OBD Cluster, per OBD Noncompliance of:

    (1)    $10,902,400 per OBD Noncompliance for Cluster 1;

    (2)    $3,881,400 per OBD Noncompliance for Cluster 2;

    (3)    $2,271,900 per OBD Noncompliance for Cluster 3;

      (4)    $2,072,000 per OBD Noncompliance for Cluster 4; and

      (5)    $1,932,000 per OBD Noncompliance for Cluster 5.

Additionally, Defendants shall submit to EPA and CARB for review and approval a remedial plan in accordance with 13 C.C.R. § 1968.5(d) to address each Noncompliance, and shall recall each affected Eligible Vehicle consistent with 13 C.C.R. § 1968.5(d) and this Consent Decree. Defendants shall not be subject to the OBD recall provisions if an Eligible Vehicle fails or is otherwise not able to complete the Inspection and Maintenance program because insufficient miles have been accumulated on the vehicle to clear any fault codes or Inspection and Maintenance readiness flags following application of the Approved Emission Modification.

d.    <u>Injunctive Relief Requirements: Section VI, Paragraph 19 (Subject Vehicle In-Use Testing)</u>.

    i.    <u>Failure to Complete In-Use Testing Requirements</u>. If Defendants fail to complete In-Use Testing in accordance with Paragraphs 19.a or 19.b of this Consent Decree, Defendants shall pay to the United States and CARB a stipulated penalty for each Day of such failure:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $5,000 | 1st through 14th Day |
| $20,000 | 15th through 30th Day |
| $50,000 | 31st Day and beyond. |

ii.    Failure to Provide Notice in Advance of In-Use Testing.  If Defendants fail to notify EPA/CARB of testing in accordance with Paragraph 19.b.vi (Notification of Testing), Defendants shall pay to the United States and CARB a stipulated penalty for each Day of such failure:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $3,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

iii.    Failure to Comply with Emission Standard, Emission Standard First Threshold, or Emission Standard Upper Threshold.  If, as determined in accordance with Paragraph 19.b.v, Eligible Vehicles updated with the Approved Emission Modification fail to meet the Emission Standard, Emission Standard First Threshold, or the Emission Standard Upper Threshold for the relevant Emission Modification Category approved in the Emission Modification Proposal Report for the relevant Emission Modification Category, Defendants shall pay the following stipulated penalties, as applicable, per Eligible Vehicle in that Emission Modification Category (but not per Day):

(1)    below the Emission Standard First Threshold, but above the Emission Standard: $7,350

(2)    below the Emission Standard Upper Threshold, but above the Emission Standard First Threshold: $16,800

(3)    above the Emission Standard Upper Threshold: $26,250.

    e.    <u>Injunctive Relief Requirements: Section VII (Corporate Compliance)</u>.

        i.    <u>Corporate Compliance Obligations</u>.  Defendants shall pay stipulated penalties per Day for each Day that Defendants fail to meet the requirements for compliance with the provisions of Section VII.  In the event that a failure to meet a requirement is covered by a specific stipulated penalty listed below, Defendants shall only pay the stipulated penalties as required by that specific subparagraph.  If no specific stipulated penalty is listed for a failure to meet a particular requirement, Defendants shall pay stipulated penalties for failing to meet that requirement as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

        ii.    <u>Segregation of Duties</u>.  Defendants shall pay stipulated penalties per Day for each Day that Defendants fail to implement and maintain any segregation of duty requirement in Paragraph 23 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $10,000 | 15th through 30th Day |
| $50,000 | 31st Day and beyond. |

        iii.    <u>Integrity Code</u>.  Defendants shall pay stipulated penalties per Day for each Day that the modification to their Integrity Code is

overdue or is otherwise not in accordance with the requirements in

Paragraph 24 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

iv.  **Employee Discipline and Compensation**.  Defendants shall pay

stipulated penalties per Day for each Day that they fail to

implement and maintain any employee discipline and

compensation requirement in Paragraph 25 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

v.  **Whistleblower System**. Defendants shall pay stipulated penalties

per Day for each Day that they fail to implement and maintain any

BPO system requirement in Paragraph 26 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

vi.  **Risk Assessment**. Defendants shall pay stipulated penalties per

Day for each Day that they fail to comply with any requirement

concerning risk assessments in Paragraph 27 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |

$10,000                31st Day and beyond.

vii.    <u>Business Partner and Supplier Integrity Management</u>. Defendants shall pay stipulated penalties per Day for each Day that they fail to comply with any requirement concerning business partner and supplier integrity management in Paragraph 28 as follows:

| <u>Penalty per Day</u> | <u>Period of Noncompliance</u> |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

viii.   <u>Compliance Management System and Technical Compliance Management System</u>. Defendants shall pay stipulated penalties per Day for each Day that they fail to comply with any requirement concerning their compliance management system and technical compliance management system in Paragraph 29 as follows:

| <u>Penalty per Day</u> | <u>Period of Noncompliance</u> |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

ix.     <u>Technical Compliance and Certification Control Measures</u>. Defendants shall pay stipulated penalties per Day for each Day that they fail to comply with any requirement concerning technical compliance and certification control measures, including, but not limited to, PEMs testing, in Paragraph 30 as follows:

| <u>Penalty per Day</u> | <u>Period of Noncompliance</u> |
|---|---|
| $2,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |

$10,000                 31st Day and beyond.

x.      Reporting of Corporate Compliance.  Defendants shall pay

stipulated penalties per Day for each Day that they fail to report on

corporate compliance measures, including, but not limited to,

failing to include corporate compliance information in other

reports, as required in Paragraph 31 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

xi.     Internal Audits.  Defendants shall pay stipulated penalties per Day

for each Day that they fail to comply with any requirement

concerning internal audits, including, but not limited to, the

implementation of corrective measures, in Paragraph 32 as

follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 30th Day |
| $2,500 | 31st through 60th Day |
| $10,000 | 61st Day and beyond. |

xii.    External Compliance Consultant.  Defendants shall pay stipulated

penalties per Day for each Day that they fail to comply with any

requirement concerning the External Compliance Consultant in

Paragraph 33 as follows:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 30th Day |

|          |                      |
|----------|----------------------|
| $10,000  | 31st through 60th Day |
| $35,000  | 61st Day and beyond. |

f. <u>Injunctive Relief Requirements: Section VIII (Mitigation)</u>.

   i.    If Defendants fail to repower or rebuild 15 non-Tier 4 compliant line-haul locomotives as required by Paragraph 35 by the specified deadlines contained in Paragraph 35.a and 36, Defendants shall pay the following stipulated penalties per violation per Day, unless Defendants submit and implement a Supplemental Mitigation Plan pursuant to Paragraphs 38 and 39:

| <u>Penalty per Day</u> | <u>Period of Noncompliance</u> |
|----------|----------------------|
| $5,000   | 1st through 14th Day |
| $10,000  | 15th through 30th Day |
| $20,000  | 31st Day and beyond |

   ii.    In the event Defendants determine that it is impractical to complete the U.S. Mitigation Program pursuant to Paragraph 38, if Defendants fail to submit a Supplemental Mitigation Plan that complies with the requirements of Paragraph 38, or fail to take all actions required by the Supplemental Mitigation Plan in accordance with the schedules and requirements of the Supplemental Mitigation Plan as required by Paragraph 38, Defendants shall pay the following stipulated penalties per violation per Day, provided that no stipulated penalty shall accrue for failure to take an action required by the Supplemental Mitigation Plan in accordance with the schedules and requirements of the Supplemental Mitigation Plan if Defendants have

resubmitted, in whole or in part, the Supplemental Mitigation Plan as required by Paragraph 38:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $5,000 | 1st through 14th Day |
| $10,000 | 15th through 30th Day |
| $20,000 | 31st Day and beyond |

g.     Reporting and Certification Requirements: Section IX (Reporting Requirements).

    i.     Timing, Content of Reports.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements of Paragraph 43 (Timing of Reports) and Paragraph 42 (Consent Decree Compliance Reports):

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

    ii.     Reporting of Violations.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements of Paragraph 44 (Reporting of Violations):

| Penalty per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

    iii.     Certification Requirements.  For each violation of the certification requirements of Paragraph 48 of this Consent Decree and Appendix B, Paragraph 4.a.i.P, except for false statements as

described in Paragraph 53.g.iv, below, for which the stipulated penalty shall be as provided therein, Defendants shall have one opportunity to self-correct the violation within 15 Days of the applicable Submission, after which time, Defendants shall pay a stipulated penalty of $200,000 for each violation.

    iv.    <u>False Statements</u>. Defendants shall pay a stipulated penalty of $1,000,000 for each Submission required to be submitted pursuant to this Consent Decree that contains a knowingly false, fictitious, or fraudulent statement or representation of material fact.

h.    <u>Information Collection and Retention Requirements: Section XIII (Information Collection and Retention)</u>.

    i.    If Defendant Mercedes-Benz USA fails to maintain within the United States a copy of all Records as required to be retained within the United States pursuant to Paragraph 81, Defendants shall pay stipulated penalties per Day for each Day that Defendant Mercedes-Benz USA fails to maintain such Records in the United States:

| Penalty per Day | Period of Noncompliance |
| --- | --- |
| $2,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

    ii.    If Defendants fail to provide the United States or CARB with an unredacted copy of a Record upon request, as required by

Paragraph 82, Defendants shall pay stipulated penalties per Day for each Day that Defendants fail to provide such a Record:

| Penalty per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $10,000 | 31st Day and beyond. |

54.     Stipulated penalties shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree, provided that there shall be only one stipulated penalty assessed per violation against the Defendants.

55.     The United States, in consultation with CARB, shall issue any demand for stipulated penalties in writing to Defendants, except for violations of Paragraph 53.c.ii, for which CARB shall issue any demand for stipulated penalties in writing to Defendants. The written demand for payment of stipulated penalties shall specifically identify the violation.

56.     Defendants shall pay any stipulated penalties to the United States and CARB, as applicable, within 30 Days of receiving the written demand. Defendants shall pay 75 percent of the total stipulated penalty amount due to the United States and 25 percent to CARB, except for violations of Paragraphs 53.c.iii to 53.c.v, for which Defendants shall pay 50 percent of the total stipulated penalty amount due to the United States and 50 percent to CARB, and violations of Paragraph 53.c.ii, for which Defendants shall pay the entire stipulated penalty amount to CARB.

57.     Either the United States or CARB may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

However, no action by either the United States or CARB may reduce or waive stipulated penalties due the other.

58.     Stipulated penalties continue to accrue as provided in Paragraph 54 during any dispute resolution period, but need not be paid unless determined to be owing and until the following:

a.     If the dispute is resolved by agreement of the Parties or by a decision of EPA/CARB that is not appealed to the District Court, Defendants shall pay accrued penalties determined to be owing, together with interest as provided in Paragraph 62, to the United States and CARB, as applicable, within 30 Days after the effective date of the agreement or the receipt of EPA's/CARB's decision or order.

b.     If the dispute is appealed to the District Court and the United States/California prevail(s) in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest as provided in Paragraph 62, to the United States and CARB, as applicable, within 60 Days of receiving the Court's decision or order, except as provided in Paragraph 58.c, below.

c.     If any Party appeals the District Court's decision and the United States/California prevail(s) in whole or in part, Defendants shall pay all accrued penalties determined by the federal appellate court to be owing, together with interest as provided in Paragraph 62, to the United States and CARB, as applicable, within 15 Days of receiving the final appellate court decision.

59. <u>Obligations from Date of Lodging to the Effective Date</u>. Upon the Effective Date, the stipulated penalty provisions of this Consent Decree shall be retroactively enforceable with regard to any and all violations of Appendix A, Paragraph 6 and Appendix B, Paragraphs 3, 4, and 5.b that have occurred from the Date of Lodging to the Effective Date, provided that stipulated penalties that may have accrued between the Date of Lodging and the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

60. Defendants shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

61. Defendants shall pay stipulated penalties owing to CARB by check, accompanied by a Payment Transmittal Form (which CARB will provide to the addressee listed in Paragraph 9 after the Effective Date), with each check mailed to:

> California Air Resources Board
> Accounting Office
> P.O. Box 1436
> Sacramento, CA 95812-1436;

or by wire transfer, in which case Defendants shall use the following wire transfer information and send the Payment Transmittal Form to the above address prior to each wire transfer:

> State of California Air Resources Board
> c/o Bank of America, Inter Branch to 0148
> Routing No. 0260-0959-3 Account No. 01482-80005
> Notice of Transfer: Accounting; Fax: (916) 322-9612
> Reference: ARB Case # C00032.

Defendants are responsible for any bank charges incurred for processing wire transfers. Stipulated penalties paid to CARB under this Consent Decree shall be deposited into the Air Pollution Control Fund for the purpose of enhancing CARB's mobile source emissions control

program through additional certification review, in-use evaluation, real-world testing, enforcement actions, and other CARB activities related to the control of air pollution.

62.     If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due and continuing until payment has been made in full. Nothing in this Paragraph shall be construed to limit the United States or California from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

63.     The payment of stipulated penalties and interest, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree, unless otherwise agreed to by the Parties in writing.

64.     <u>Non-Exclusivity of Remedy</u>. Stipulated penalties are not the United States' or California's exclusive remedy for violations of this Consent Decree, including violations of this Consent Decree that are also violations of law. Subject to the provisions of Section XIV (Effect of Settlement/Reservation of Rights), the United States and California expressly reserve the right to seek any other relief they deem appropriate for Defendants' violation of this Consent Decree or applicable law, including but not limited to an action against Defendants for statutory penalties where applicable, additional injunctive relief, mitigation or offset measures and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree (to the United States or to CARB, respectively).

## XI.    FORCE MAJEURE

65.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation.   The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.   "Force majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree. Notwithstanding the foregoing, any failure by any supplier to deliver the Aftertreatment System hardware necessary for an Approved Emission Modification which delays or prevents the performance of any obligation under Section VI (Subject Vehicle Compliance), Appendix A, or Appendix B of this Consent Decree shall constitute "force majeure," and any COVID-19 public health crisis event—even though COVID-19 is already under way—which delays or prevents an obligation under Section VI (Subject Vehicle Compliance), Section VII (Corporate Compliance), Section VIII (Mitigation) (except Paragraph 41), Appendix A, or Appendix B may constitute "force majeure," provided in either instance that Defendants otherwise meet the requirements for force majeure under this Consent Decree.

66.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, for which Defendants intend or may intend to assert a claim of force majeure, whether or not caused by a force majeure event, Defendants shall provide notice by email and telephone to EPA/CARB, within seven Business Days of when

Defendants first knew that the event might cause a delay. Within 14 Days thereafter, Defendants shall provide in writing to EPA/CARB an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay or the effect of the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the requirements in this Paragraph shall preclude Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. For purposes of this Paragraph, Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors (excluding any supplier delivering Aftertreatment System hardware necessary for an Approved Emission Modification) knew or should have known.

67.     If EPA/CARB agree that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA/CARB, as applicable, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA/CARB will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

68.     If EPA/CARB do(es) not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA/CARB will notify Defendants in writing of its/their decision.  If EPA/CARB do(es) not provide a response within 30 Days after receipt of Defendants' written force majeure notice, Defendants may treat the absence of a response as a denial of the written force majeure notice.

69.     If Defendants elect to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), they shall do so no later than 15 Days after receipt of EPA's/CARB's written notice or 15 Days after the 30 Day period referenced in the preceding Paragraph, as applicable.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 65 and 66.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to EPA/CARB and the Court, as applicable.

## XII.    DISPUTE RESOLUTION

70.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising between the Parties under or with respect to this Consent Decree.  Failure by the Defendants to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by the United States or California to enforce any obligation of Defendants arising under this Consent Decree.

71.     <u>Informal Dispute Resolution</u>.  Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the United States and CARB a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute, including, where applicable, whether the dispute arises from a decision made by EPA and CARB jointly, or EPA or CARB individually.  The period of informal negotiations shall last for 30 Days after the date the Notice of Dispute is received by Plaintiffs, unless that period is modified by written agreement signed by all Parties.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States/CARB shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

72.     <u>Formal Dispute Resolution</u>.  Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States/CARB a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

73.     The United States/CARB shall serve its/their Statement of Position within 45 Days of receipt of Defendants' Statement of Position.  The United States'/CARB's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States/CARB.  The United States'/CARB's Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

74.     Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States/CARB, in accordance with Section XVI (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 30 Days of receipt of the United States'/CARB's Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree. The motion may not raise any issue not raised in informal dispute resolution pursuant to Paragraph 71, unless the Plaintiffs raise a new issue of law or fact in the Statement of Position. If Defendants wish to raise in their motion seeking judicial resolution of the dispute new facts that became available after the completion of the informal dispute resolution process, Defendants shall re-initiate the dispute resolution process in accordance with Paragraph 71 and include the new facts in the Notice of Dispute.

75.     The United States/California shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court. Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

76.     <u>Standard of Review</u>

a.      <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought pursuant to Paragraph 74 that pertains to (1) the adequacy or appropriateness of plans or procedures to implement plans, schedules, or any other item that requires approval by EPA/CARB under this Consent Decree, (2) the adequacy of the performance of work undertaken pursuant

to this Consent Decree, and (3) all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of EPA/CARB is arbitrary and capricious or otherwise not in accordance with law based on the administrative record. For purposes of this Paragraph, EPA/CARB will maintain an administrative record of the dispute, which will contain all statements of position, including supporting documentation, submitted pursuant to this Section. Prior to the filing of any motion, the Parties may submit additional materials to be part of the administrative record pursuant to applicable principles of administrative law.

      b.    <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 72, Defendants shall bear the burden of demonstrating by a preponderance of the evidence that their position complies with this Consent Decree.

77.    In any disputes brought under this Section, it is hereby expressly acknowledged and agreed that this Consent Decree was jointly drafted in good faith by the United States, California, and Defendants. Accordingly, the Parties hereby agree that any and all rules of construction to the effect that ambiguity is construed against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Consent Decree.

78.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent

Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 58. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII.   INFORMATION COLLECTION AND RETENTION

79.     The United States, CARB, and their representatives, including attorneys, contractors, and consultants (collectively, "Agency Representatives"), shall have the right of entry, upon presentation of credentials, at all reasonable times into any of Defendants' offices, plants, or facilities:

  a.     to monitor the progress of activities required under this Consent Decree;

  b.     to verify any data or information submitted to the United States or CARB in accordance with the terms of this Consent Decree;

  c.     to inspect records related to this Consent Decree;

  d.     to conduct or observe testing related to this Consent Decree, whereupon a representative of Defendants shall be given the opportunity to accompany the Agency Representatives conducting such testing;

  e.     to obtain documentary evidence, including photographs and similar data, related to this Consent Decree;

  f.     to assess Defendants' compliance with this Consent Decree; and

  g.     for other purposes as set forth in 42 U.S.C. § 7542(b) and Cal. Gov't Code § 11180 et seq.

80.     Upon request, and for purposes of evaluating compliance with this Consent Decree, Defendants shall, as soon as is reasonably practicable, provide to EPA/CARB or the Agency Representatives at locations to be designated by EPA/CARB:

      a.     a reasonable number of vehicles matching the configuration of the proposed Emission Modification in the applicable Emission Modification Proposal Report, pursuant to Appendix B, Paragraph 5.b hereto, for emissions testing;

      b.     specified software, hardware, and related documentation for vehicles matching the configuration of the proposed Emission Modification in the applicable Emission Modification Proposal Report, pursuant to Appendix B, Paragraph 5.b hereto, including any tools needed for testing;

      c.     reasonable requests for English translations of software or Defendants' documents; or

      d.     other items or information that could be requested pursuant to 42 U.S.C. § 7542(a) or Cal. Gov't Code § 11180 et seq.

81.     Until three years after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve, all Records in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, that relate to Defendants' performance of their obligations under this Consent Decree. The United States and CARB have an interest in these Records, which are necessary to their ability to oversee and assess Defendants' compliance with the terms of this Consent Decree resolving the United States' and CARB's allegations in their respective Complaints. Defendant Mercedes-Benz USA shall maintain within the United States a copy of

all Records required to be retained by Defendants pursuant to this Paragraph, except for Records that relate solely to Defendant Daimler AG's performance of its obligations under Section VII (Corporate Compliance) to the extent that such Records are retained by Daimler AG pursuant to this Paragraph. These information-retention requirements shall apply regardless of any contrary corporate or institutional policies or procedures. Nothing in this Paragraph shall apply to any documents in the possession, custody, or control of any outside legal counsel retained by Defendants in connection with this Consent Decree or of any contractors or agents retained by such outside legal counsel solely to assist in the legal representation of Defendants.

82.    At any time during the three-year information-retention period of Paragraph 81, upon request by the United States or CARB, a Defendant receiving a request shall provide to the requesting Plaintiff copies of any Records required to be maintained under that Paragraph. Defendant Daimler AG alone may apply reasonable redactions to Personal Information contained in Records that relate to its performance of its obligations under this Consent Decree, provided that Daimler AG retains original copies of such Records. However, Defendant Daimler AG may not redact (1) the names of auditors who participated in any corporate audit conducted pursuant to the requirements of Section VII (Corporate Compliance); or (2) the name of the External Compliance Consultant retained pursuant to the requirements of Section VII (Corporate Compliance). Upon request by the United States or CARB, Defendant Daimler AG shall provide unredacted copies of such Records.

83.    Defendants may assert that certain Records are privileged or protected as provided under federal or California law. If Defendants assert such a privilege or protection, they shall provide the following in writing: (1) the title of the Record; (2) the date of the Record; (3) the name and title of each author of the Record; (4) the name and title of each addressee and

recipient; (5) a description of the subject of the Record; and (6) the privilege or protection asserted by Defendants. However, Defendants may make no claim of privilege or protection regarding: (1) any data regarding the Subject Vehicles that Defendants are required to create or generate pursuant to this Consent Decree; or (2) the final version of a portion of any Record that Defendants are required to create or generate pursuant to this Consent Decree.

84.    Confidential Business Information. Defendants may also assert that Records required to be provided under this Section or Section IX (Reporting Requirements) are protected as CBI under 40 C.F.R. Part 2 or 17 C.C.R. §§ 91000 et seq. As to any Record that Defendants seek to protect as CBI, Defendants and the United States and/or California, as applicable, shall follow the procedures set forth in 40 C.F.R. Part 2, and, for California, in 17 C.C.R. §§ 91000 et seq.

85.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or California pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain Records imposed by applicable federal or state laws, regulations, or permits.

## XIV.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

86.    Subject to the reservations of rights in this Section, this Consent Decree shall resolve and settle all of the United States' civil claims for civil penalties and injunctive relief against Defendants through the Date of Lodging for: (1) the violations alleged in the U.S. Complaint, (2) violations arising from or relating to the software, calibrations, and/or functions of the emission control system, combustion system, and transmission system for the Subject Vehicles, and (3) violations arising from or relating to Defendants' applications for a certificate

of conformity for the Subject Vehicles and any information provided to EPA for the purpose of securing such certificates. Payment of the civil penalty described in Paragraph 9 above also resolves the civil claims of CBP, as set forth in the separate settlement agreement between Defendants and CBP.

87.     Subject to the reservations of rights in this Section, this Consent Decree shall resolve and settle all of California's civil claims for civil penalties and injunctive relief against Defendants through the Date of Lodging for: (1) the violations alleged in the California Complaint or any other allegations asserted by CARB before March 31, 2017, (2) violations arising from or relating to the software, calibrations, and/or functions of the emission control system, combustion system, and transmission system for the Subject Vehicles, and (3) violations arising from or relating to Defendants' applications for an executive order for the Subject Vehicles and any information provided to CARB for the purpose of securing such executive orders.

88.     Neither this Consent Decree nor Defendants' consent to its entry constitutes an admission by Defendants of violations alleged by EPA or CARB in the Complaints or any other allegations asserted by CARB before March 31, 2017, related to the Subject Vehicles. Defendants reserve all defenses and all rights and remedies, legal and equitable, available to them in any action by a non-party pertaining to the Act, or any other federal, state, or local statute, rule, or regulation.

89.     The United States and California reserve all legal and equitable remedies to enforce the provisions of this Consent Decree. The United States further reserves any claim(s) of any agency of the United States, other than EPA.

90.   California further reserves, and this Consent Decree is without prejudice to any and all civil claims, rights, and remedies against Defendants with respect to:

a.   Further injunctive relief, including prohibitory and mandatory injunctive provisions intended to enjoin, prevent, and deter future misconduct, and/or incentivize its detection, disclosure, and/or prosecution; or to enjoin false advertising, violation of environmental laws, violation of consumer laws, the making of false statements, or the use or employment of any practice that constitutes unfair competition;

b.   Further injunctive relief pursuant to California Health and Safety Code as alleged in the California Complaint to mitigate the total lifetime excess emissions in California from the Subject Vehicles, which injunctive relief is fully set forth in and resolved by the California Partial Consent Decree, lodged concurrently with this Consent Decree;

c.   Any part of any claims for the violation of securities or false claims laws;

d.   Any criminal liability;

e.   Any and all other claim(s) of any officer or agency of the State of California, other than CARB;

f.   Any and all claims for relief to customers, including claims for restitution, refunds, rescission, damages, disgorgement;

g.   Any and all claims of the California Attorney General, except those claims released and/or resolved by the California Partial Consent Decree, lodged concurrently with this Consent Decree; and

h.   Any and all claims held by individual consumers.

91.     This Consent Decree shall not be construed to limit the rights of the United States or California to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as specifically provided in Paragraphs 86–87. The United States and California further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at any of Defendants' facilities, or posed by Defendants' Subject Vehicles, whether related to the violations addressed in this Consent Decree or otherwise.

92.     In any subsequent administrative or judicial proceeding initiated by the United States or California for injunctive relief, civil penalties, or other appropriate relief relating to Defendants' violations, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or California in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 86–87.

93.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and California do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent

Decree will result in compliance with provisions of the Act, or with any other provisions of federal, state, or local laws, regulations, or permits.

94.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or California against any third parties not party to this Consent Decree, nor does it limit or affect the rights of third parties not party to this Consent Decree against Defendants, except as otherwise provided by law.

95.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV.    COSTS

96.     The Parties shall bear their own costs of this action, including attorneys' fees, subject to Paragraph 90.e, except that the United States and California shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty, mitigation, or stipulated penalties due under this Consent Decree but not paid by Defendants.

## XVI.   NOTICES

97.     Unless otherwise specified in this Consent Decree, Materials shall be accompanied by a cover letter and submitted electronically as described below, unless such notices are unable to be uploaded to the CDX electronic system (in the case of EPA) or transmitted by email (in the case of any other party).  For all notices to EPA, Defendants shall register for the CDX electronic system and upload such notices at https://cdx.epa.gov/epa_home.asp.  All Emission Modification Proposal Reports, OBD Interim Reports, documents and data submitted pursuant to Paragraph 19 (Subject Vehicle In-Use Testing), and all revisions and amendments thereto, shall be submitted (1) on an electronic data

site hosted by Daimler AG that is accessible to the United States, EPA, CARB, and California at all times until 60 Days after Termination of this Consent Decree, and from which the United States, EPA, CARB, and California are able to download all data hosted on that site; and (2) on a hard disk that must be mailed to the addresses specified below no later than the date that the next set of semi-annual reports are due after the relevant data has been uploaded to the data site, and an email specifying the method of mailing and tracking information shall be sent to the addressed below. If there is any discrepancy between the information submitted to the electronic data site and the information submitted on the hard disk, the information submitted to the data site shall control. Any notice that cannot be uploaded to CDX or the Daimler-hosted electronic data site or transmitted via email or via a secure server shall be provided in writing via overnight mail (and if any attachment is voluminous, it shall be provided on a disk, hard drive, or other equivalent successor technology) to the addresses below:

| | |
|---|---|
| As to the United States: | DOJ at the email, or if necessary, the mail addresses below<br>**and**<br>EPA (via CDX or the mail address below if CDX is not possible) |
| As to DOJ by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-2-1-11788 |
| As to DOJ by U.S. mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-5-2-1-11788 |
| As to DOJ by overnight mail: | 4 Constitution Square<br>150 M Street, N. E.<br>Suite 2.900<br>Washington, D.C. 20002<br>Re: DJ # 90-5-2-1-11788 |

| | |
|---|---|
| As to EPA by email: | ortega.kellie@epa.gov |
| As to EPA by mail: | Director, Air Enforcement Division<br>1200 Pennsylvania Avenue NW<br>William J Clinton South Building<br>MC 2242A<br>Washington, D.C. 20460 |

Emission Modification Proposal Reports, OBD Interim Reports, documents and data submitted pursuant to Paragraph 18.a19 (Subject Vehicle In-Use Testing), and all revisions and amendments thereto sent via hard drive shall be further labelled, "Attn: Gregory Orehowsky," and "Time Sensitive."

Emission Modification Proposal Reports, OBD Interim Reports, documents and data submitted pursuant to Paragraph 19 (Subject Vehicle In-Use Testing), and all revisions and amendments thereto shall also be sent to OTAQ via hard drive at the following address:

Director, Compliance Division
USEPA National Vehicle and Fuel Emissions Laboratory
2565 Plymouth Road
Ann Arbor, MI 48105

Submissions to OTAQ shall be labelled, "Attn: Paul Dekraker" and "Time Sensitive."

| | |
|---|---|
| As to EPA by telephone: | 202-564-0652 |
| As to CBP by email: | Marta.Williams@cbp.dhs.gov |
| As to California: | CARB **and** CA AG at the email or mail addresses below, as applicable |
| As to CARB by email: | DaimlerCD@arb.ca.gov |
| As to CARB by telephone: | (916) 322-2884 |
| As to CARB by mail: | Chief Counsel<br>California Air Resources Board<br>Legal Office |

|  | 1001 I Street |
|  | Sacramento, California  95814 |

As to CA AG by email:    gary.tavetian@doj.ca.gov
                         josh.caplan@doj.ca.gov

john.sasaki@doj.ca.gov

As to CA AG by mail:     Gary Tavetian
                         Supervising  Deputy Attorney General
                         Natural Resources Law Section
                         California  Department of Justice
                         300 South Spring Street
                         Los Angeles, CA 90013

                         Robert Byrne
                         Senior Assistant Attorney General
                         Natural Resources Section
                         Office of the Attorney General
                         P.O. Box 944255
                         Sacramento, CA 94244-2550

As to Defendants:        Gibson,  Dunn & Crutcher, LLP, at the email or mail
                         addresses below,  as applicable

                         Daimler AG, at the email or mail addresses below,
                         as applicable

                         MBUSA, LLC, at the email or mail addresses
                         below, as applicable

As to one or more of the
Defendants by email:     rludwiszewski@gibsondunn.com
                         sfletcher@gibsondunn.com
                         dirk.lindemann@daimler.com
                         hendrik.heitsch@daimler.com
                         matthew.j.everitt@mbusa.com
                         anthony.zepf@mbusa.com

As to one or more of the
Defendants by mail:      Raymond  B. Ludwiszewski
                         Stacie B. Fletcher
                         GIBSON, DUNN & CRUTCHER LLP
                         1050 Connecticut  Avenue Northwest
                         Washington, District of Columbia  20036
                         Telephone:  (202) 955-8500

Facsimile: (202) 467-0539

Dirk Lindemann
Hendrik Heitsch
DAIMLER AG
Mercedesstraße 120
Building 120, Floor 8
(HPC 096 – F 387)
70327 Stuttgart

Matthew J. Everitt
Anthony D. Zepf
MERCEDES-BENZ USA, LLC
One Mercedes-Benz Drive
Sandy Springs, GA 30328-4312

98.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided in the immediately preceding Paragraph.

99.     Materials submitted pursuant to this Section shall be deemed submitted upon uploading electronically, emailing, or mailing as required, except as provided elsewhere in this Consent Decree or by mutual agreement of the Parties in writing.

## XVII.  EFFECTIVE DATE

100.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant hereby agrees that it shall be bound to perform duties scheduled to occur between the Date of Lodging and the Effective Date, and shall perform those duties pursuant to this Consent Decree. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter this Consent Decree, then the preceding requirement to perform duties scheduled to occur between the Date of Lodging and the Effective Date shall terminate.

## XVIII. RETENTION OF JURISDICTION

101.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XII (Dispute Resolution) and XIX (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## XIX.    MODIFICATION

102.    Except as otherwise set forth in this Section or in Appendix A, Paragraph 14, the terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.

103.    The United States or California, as applicable, will file any non-material modifications with the Court. Once the non-material modification has been filed, Defendants shall post the filed version (with ECF stamp) on the website required by Appendix A, Paragraph 16 (Online Access to Information). The following modifications will be considered non-material: (1) changes to the method of submission of Materials unless this Consent Decree originally mandated that a Material be made public and the proposed change involves changing that method of submission to make it non-public; (2) extensions of time not to exceed 90 Days at a time or 180 Days cumulatively; and (3) corrections of scrivener's errors.

104.    Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 76, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.   TERMINATION

105.    No earlier than five years after the Effective Date, after Defendants have completed the requirements of Section VI (Subject Vehicle Compliance) and Section VIII (Mitigation), and Appendices A and B, have demonstrated that they are in compliance with the requirements of Section VII (Corporate Compliance), have complied with all other requirements of this Consent Decree, and have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the United States and California a request for termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation.  Defendants may serve such a request for termination notwithstanding the requirements of Appendix A, Paragraph 5 (Prohibition on Sales of Vehicles that Have Not Entered into Commerce); Appendix A, Paragraph 6 (Resale and Export of Subject Vehicles); Appendix A, Paragraph 7 (Emission Modification Available at No Cost); Appendix A, Paragraph 16 (Online Access to Information); and Appendix A, Paragraphs 18.a–e, 18.h, and 18.i (Extended Warranty for Modified Eligible Vehicles).

106.    Following receipt by the United States and California of Defendants' request for termination, the Parties shall confer informally concerning the request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with California, agrees that this Consent Decree may be terminated, the United States will file a motion to terminate this Consent Decree, provided, however, that the provisions associated with effectuating and enforcing Appendix A, Paragraph 5 (Prohibition on Sales of Vehicles that Have Not Entered into Commerce) and Appendix A, Paragraph 6 (Resale and Export of Subject Vehicles) shall continue in full force and effect for ten years from the Effective Date; and the

provisions associated with effectuating and enforcing Appendix A, Paragraph 7 (Emission Modification Available at No Cost), Appendix A, Paragraph 16 (Online Access to Information), and Appendix A, Paragraphs 18.a–e, 18.h, and 18.i (Extended Warranty for Modified Eligible Vehicles) shall continue in full force and effect until those provisions terminate by their own terms.

107.    If the United States, after consultation with California, does not agree that this Consent Decree may be terminated, Defendants may invoke Dispute Resolution under Section XII. However, Defendants shall not seek Dispute Resolution of any dispute regarding termination until 45 Days after service of their request for termination.

## XXI.    PUBLIC PARTICIPATION

108.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding this Consent Decree disclose facts or considerations indicating that this Consent Decree is inappropriate, improper, or inadequate. California reserves the right to withdraw or withhold its consent if the United States does so. Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of this Consent Decree, unless the United States has notified Defendants in writing that it no longer supports entry of this Consent Decree.

## XXII.    SIGNATORIES/SERVICE

109.    Each undersigned representative of Defendants and California and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of

Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

110.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by facsimile or emailed "PDF") shall have the same effect as an original.

111.    Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendants need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree, in which case Defendants' answer would be due 30 Days following the Court's order.

## XXIII. INTEGRATION

112.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Consent Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXIV. 26 U.S.C. § 162(f)(2)(A)(ii)  IDENTIFICATION

113.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), the performance by Defendants of Section II (Applicability), Paragraph 5; Section V (Approval of Submissions;  U.S./EPA/CARB Decision-Making), Paragraph 14; Section VI (Subject Vehicle Compliance), Paragraphs 18–19, and related Appendices A and B; Section VII (Corporate Compliance), Paragraphs 20–34, and related Appendix D; Section VIII (Mitigation), Paragraphs 35–40; Section IX (Reporting Requirements), Paragraphs 42–44 and 46–48; and Section XIII (Information Collection and Retention), Paragraphs 79–82, is restitution or required to come into compliance with law.

## XXV.  FINAL JUDGMENT

114.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, California, and Defendants.

## XXVI. HEADINGS

115.    Headings to the Sections and Subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXVII.        APPENDICES

116.    The following Appendices are attached to and part of this Consent Decree:

Appendix A is the Emission Modification Program;

Appendix A, Attachment A is the Approved Label for Emission Modification Category 1;

Appendix A, Attachment B is the Approved Consumer Emission Modification Disclosures for Categories 1 and 9;

Appendix A, Attachment C is the Approved Dealer Emission Modification Disclosures for Emission Modification Categories 1 and 9;

Appendix B is Protocol for Assessment of Proposed Emission Modification (Test Protocol);

Appendix B, Attachment A is Emission Plus Test Vehicles and OBD Demonstration Vehicles;

Appendix B, Attachment B is Sample Signal Data;

Appendix B, Attachment C is Special Cycles;

Appendix B, Attachment D is PEMS Routes;

Appendix B, Attachment E is Data Parameters for Flat Files;

Appendix B, Attachment F is Emission, Special Cycle and Fuel Economy Testing Overview;

Appendix B, Attachment G is NVH Protocol;

Appendix B, Attachment H is Drivability Protocol;

Appendix B, Attachment I is Emission Modification Configuration Components (table);

Appendix C is ECU Signals for In-Use Vehicle Testing with Production ECU;

Appendix D is Defendants' Compliance Operating Plan; and

Appendix E is Information and Parameters Reported for Gasoline Vehicles Prior to Certification.

Dated and entered this __ Day of _____, 2020,


_____
UNITED STATES DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Daimler AG & Mercedes-Benz USA, LLC*

FOR THE UNITED STATES OF AMERICA:


9/11/2020
Date

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


LORI JONAS
Assistant Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice


STEFAN J. BACHMAN
Trial Attorney
STEVEN O'ROURKE
Senior Attorney
JEROME MacLAUGHLIN
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Daimler AG & Mercedes-Benz USA, LLC*

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

9/10/2020
Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

ROSEMARIE A. KELLEY
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

EVAN BELSER
Acting Director, Air Enforcement Division,
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

BRIANNA IDDINGS
KELLIE ORTEGA
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *California v. Daimler AG & Mercedes-Benz USA, LLC*

FOR THE PEOPLE OF THE STATE OF CALIFORNIA BY AND THROUGH THE CALIFORNIA AIR RESOURCES BOARD:

GARY E. TAVETIAN
Supervising Deputy Attorney General
JOSHUA M. CAPLAN
JOHN SASAKI
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101

THE UNDERSIGNED PARTY enters into the Consent Decree in the matter of *California v. Daimler AG & Mercedes-Benz USA, LLC*

FOR THE CALIFORNIA AIR RESOURCES BOARD:

9/9/2020
Date

MARY D. NICHOLS
Chair
California Air Resources Board
1001 I Street
Sacramento CA 95814

RICHARD W. COREY
Executive Officer
California Air Resources Board
1001 I Street
Sacramento CA 95814

ELLEN M. PETER
Chief Counsel
D. ARON LIVINGSTON
Assistant Chief Counsel
ALEXANDRA KAMEL
Senior Attorney
Legal Office
California Air Resources Board
1001 I Street
Sacramento CA 95814

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Daimler AG & Mercedes-Benz USA, LLC* and in the matter of *California v. Daimler AG & Mercedes-Benz USA, LLC*

FOR DAIMLER AG:

13.8 . 2020
_____
Date

ppa
_____
DR. JÜRGEN GLEICHAUF
Vice President Legal Product
DAIMLER AG
Mercedesstraße 120
Building 120, Floor 8
(HPC 096 – F 387)
70327 Stuttgart

ppa
_____
DR. TORSTEN EDER
Vice President Mercedes-Benz Powertrain
DAIMLER AG
Mercedesstraße 137
Building 128, Floor 9
(HPC 019 – C 750)
70327 Stuttgart

144

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Daimler AG & Mercedes-Benz USA, LLC* and in the matter of *California v. Daimler AG & Mercedes-Benz USA, LLC*

FOR MERCEDES-BENZ USA, LLC:

_13 Aug 2020_
Date

MATTHEW EVERITT
Vice President and General Counsel
MERCEDES-BENZ USA, LLC
One Mercedes-Benz Drive
Sandy Springs, GA 30328-4312

CHRISTIAN TREIBER
Vice President Customer Service
MERCEDES-BENZ USA, LLC
One Mercedes-Benz Drive
Sandy Springs, GA 30328-4312

145

COUNSEL FOR DAIMLER AG
AND MERCEDES-BENZ USA,
LLC

8/14/20

Date

RAYMOND B. LUDWISZEWSKI
STACIE B. FLETCHER
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue Northwest
Washington, District of Columbia 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
rludwiszewski@gibsondunn.com
sfletcher@gibsondunn.com